UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IAN OLSON,

     Plaintiff

     vs.

MACALESTER COLLEGE,

     Defendant.

Case No. _____

## COMPLAINT AND JURY DEMAND

### I.  INTRODUCTION

1.     Plaintiff Ian Olson, who suffers from bipolar disorder and autism spectrum disorder, brings suit under Title IX of the Education Amendments of 1972, 42 USC § 1681, et seq. ("Title IX"), Title III of the Americans with Disabilities Act, 42 U.S.C. 12181, et seq. ("ADA"), Section 504 of the Rehabilitation Act, 29 USC § 794 ("Section 504") as well as state-law claims sounding in negligence and breach of contract.

2.     After a ten-year effort to overcome disability, Olson would have graduated from Defendant Macalester College ("Macalester") with a double BA degree in neuroscience studies and philosophy, on May 16, 2020.  On May 8, 2020, Macalester wrongly expelled Olson.

3.     Macalester expelled Olson after he and his then girlfriend, fellow Macalester student Jane Roe,[1] broke up.  They had a difficult relationship, and from August – October 2019, Olson wanted to end the relationship and for Roe to move out of his apartment.  She had moved in with him in August 2019.  After breaking up, Jane Roe submitted a Title IX

---

[1] Jane Roe's real name is known to Macalester and a pseudonym is used here.

complaint to Macalester, and Macalester acted immediately.  Until Jane Roe complained of

Olson to Macalester's Title IX Office, there had never been a complaint against Olson for

violent behavior or any form of harassment at Macalester.

4.      Olson also submitted a complaint against Jane Roe, but Macalester repeatedly

stalled any action on his complaint, which alleged substantially the same misconduct.  Olson

repeatedly asked for reasonable accommodation in the campus prosecution that ensued, for

example, to be allowed an electronic copy of the thousands of pages of investigation

materials generated by Macalester's Title IX office.  Macalester refused.

5.      The long journey to complete his education at Macalester cost over $500,000

in tuition and fees, which Olson has now forfeited.

## II.   PARTIES

6.      Ian Olson is a United States citizen who resides in Madison, Wisconsin.

7.      Macalester College ("Macalester") is a private institution of higher education,

which receives federal funding, with its principal place of business at 1600 Grand Ave., St.

Paul, Minnesota.

## III.   JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiff's causes

of action arise under Title IX and the Americans with Disabilities Act (ADA), laws of the

United States.

9.      This Court also has jurisdiction under 28 U.S.C. § 1332(a)(1) because there is

complete diversity and Macalester's wrongful deprivation of Ian Olson's degree and other

damages exceed $75,000.  This Court has supplemental jurisdiction over all state claims

under 28 U.S.C. § 1367(a).

10.    Venue is proper in the U.S. District Court for the District of Minnesota under

28 U.S.C. § 1391(b) because Defendant resides within the jurisdiction of this Court, and a

substantial part of the acts and omissions giving rise to Plaintiff's claims took place within

the jurisdiction of this Court.

## IV.   FACTS

### A. Ian Olson Enrolls in Macalester, is Diagnosed with Psychiatric Conditions, and Overcomes Serious Adversity to be in a Position to Graduate, Including by Advocating for Others Suffering from Discrimination Based on Disability.

11.    As with many young men and women, the psychiatric conditions with which

Olson will struggle for the rest of his life manifested first in his college years.  Olson

graduated from high school in June 2010 in the top 10% of his class.  He was also a varsity

athlete, captain of his cross-country team in high school, and on the swimming team in high

school.  He had had dreams of competing for Macalester, where he enrolled as a freshman in

the fall of 2010.  He was diagnosed with bipolar disorder in June 2011.  A diagnosis of

autism spectrum disorder followed in 2013.

12.    Over the following decade, Olson contended with his psychiatric condition.

Olson's condition was known to Macalester's Disability Services office ("DS") (with which

he registered), to his instructors, and to Macalester's administration.  He repeatedly asked for

reasonable accommodations, was forced to take medical leave on several occasions, but he

nevertheless persevered.

13.    As Olson struggled with his psychiatric condition, he faced serious adversity, including police brutality, which he struggled to overcome while also pursuing a degree.

14.    In May 2013, Olson suffered an episode of mania, a manifestation of his bipolar disorder.  He had to enter the hospital, and while in the emergency room, the medical staff threatened to catheterize him and subject him to involuntary tests.  Terrified, Olson resisted.  The staff called a police officer, who restrained Olson with a choke hold with such force that he passed out.

15.    Olson was released after 72 hours.  The court determined that Olson did not appear to be a danger to himself or others.

16.    Olson returned to his family home in Madison, Wisconsin, for treatment at Journey Mental Health Center.  However, his manic episode persisted, exhibiting itself through "pressured speech."  "Pressured speech" and accompanying symptoms are common for those afflicted by bipolar disorder, of which Macalester had actual knowledge. Individuals manifesting the symptom of mania have an extreme need to share their thoughts, ideas, or comments.  They may speak rapidly in incomprehensible outbursts; they may speak louder than is appropriate without the ability to stop or allow others to speak; they may have an urgency to announce what they are thinking without exercising any social control; but at the same time, they may be unable to maintain or articulate coherent thoughts.

17.    When Olson is placed under stress, he is prone to verbal outbursts, which are exacerbated if he is beset by a manic episode.  Even when he is not manic, it is difficult for Olson to maintain emotional control during confrontations because of his illness.  Although

4

his illness has manifested itself verbally, through symptoms such as pressured speech,

importantly, it does not manifest in physical violence.

18.     Precisely because pressured speech is often incoherent and disorganized, a

bipolar individual exhibiting pressured speech can feel like their verbal outbursts are

controlling them rather than vice versa.  Ideas and emotions spill out rapidly and forcefully,

without stopping at appropriate intervals when a neurotypical individual would know to let

others speak or know to choose words carefully or strategically.  It is sometimes impossible

to carry on a conversation because the symptomatic person with pressured speech will not

stop long enough for another person to speak.  It is equally difficult for a symptomatic

person with pressured speech to recall what he or she said, precisely because the speech is

often incoherent and disorganized.

19.     Again, in May 2013, although Olson's treating professionals had cleared him

for release from Journey Mental Health Center, a police officer on site decided he was not fit

to be released.  The officer detained Olson, restrained him, and took him to a solitary

confinement cell that is 6-feet by 9-feet at the Dane County Jail.

20.     Olson lost 15 pounds, slept only sporadically, suffered cuts and bruises from

his restraints, and shivered in the cold because of the bed, which was simply a concrete

bench.  An overhead light remained on 24 hours a day.

21.     For 72 hours, Olson was deprived of his medication.  By the time his family

could bring him his medication, Olson's condition had deteriorated.

22.     The police had placed Olson in a "suicide smock."  Then the police fastened

Olson to a restraint chair.

5

23.     After this nightmare, Olson was transferred to Mendota Mental Health Institute by court order.  So began a summer of hospitalizations, moving from one institution to another, totaling six moves.  This had as much to do with insurance complications and county funding issues rather than any coherent treatment and his need for stability.

24.     Olson's case became an example of the abuse and inhumane treatment of psychiatric patients as well as the abuse of solitary confinement more generally.  Olson's treatment highlighted the substitution of police brutality for proper medical treatment of psychiatric patients.

25.     Olson was becoming a poster child not only for the overreaction of law enforcement but also for the quasi-criminalization of the mentally ill, which unfortunately Macalester later continued.

26.     Nevertheless, Olson made a virtue of his adversity.  In response to these and similar experiences, Olson chose a path, not of anger and resentment, but of constructive work for change.

27.     He began to work with the Barbara Schneider Foundation in Minneapolis/St. Paul, which works to improve responses to those suffering mental health crises and also to prevent mental health crises.

28.     Olson's engagement in civic activism also fit with Macalester's purported curriculum, which emphasizes service-learning courses and community involvement.  In 2018, Olson contributed to the Macalester community by speaking at a "Gap Year Panel." Olson spoke about being forced to take "gap years" (that is, leaves of absence) due to

6

Macalester's unwillingness to accommodate students with psychiatric conditions. Olson had also spoken on campus at the foundation of a new student group, Building Bridges, of which he also served as secretary. Building Bridges is dedicated to restorative justice. One of the topics of Olson's talk was the ease and eagerness with which Macalester expels and discourages disabled students. Jane Roe attended this talk and sat in the front row to see Olson.

29.     By early 2018, Olson was able to manage the disruptive symptoms of his illness with institutionally designed accommodations and treatment from a community of mental health care professionals. He also achieved acceptance within the student body and among the faculty, despite his condition.

**B. Macalester's Actual Knowledge of Olson's Disability.**

30.     Olson and his treating professionals made Macalester aware of his psychiatric condition and symptoms.

31.     As recently as November 1, 2018, Olson's treating psychiatrist, Dr. Henry Emmons, wrote to Macalester to support Olson's request for reasonable academic accommodation. Dr. Emmons identified Olson's diagnosis and expressed his professional opinion that Olson's treatment had improved his symptoms so that he was otherwise capable of performing at the academic standards of Macalester.

32.     Dr. Emmons informed Macalester, "increased stress and lack of sleep are both possible triggers for his illness." Olson and Dr. Emmons further explained the manifestations of his illness multiple times to the Macalester Title IX Office.

**C. Macalester's Pattern and Practice of Discriminating against Olson on the Basis of Disability.**

33.     Neither the Title IX Office nor the investigators hired by Macalester to interrogate Olson ever informed themselves of the meaning or nature of his symptoms, his mental illness, or the effect of his mental illness on his ability to interpret and testify about past events.  The Title IX Office would not consult with DS.

34.     Instead, Macalester has quasi-criminalized even ordinary campus speech, if any utterance makes others feel uncomfortable.  Macalester promotes a pedagogy that equates speech with violence.  This placed Olson at special risk due to his symptom of compulsive, pressured speech.

35.     For example, at Macalester, "sexual harassment" includes any "sexual or gender-based verbal, written, or physical conduct that is unwanted … or creates an environment that interferes with the wellbeing and/or success of an individual."  This means a student, like Olson, can be found responsible just because another student subjectively feels that a sexual relationship is "unwanted" (regardless of consent) or "interfering" with their "wellbeing" or "success" -- whatever the bureaucrats of Macalester's Title IX Office determine that means.

36.     Macalester selectively applies and enforces these vague policies.  When Olson reported to Macalester's Title IX Office that he found Jane Roe's sexual interest in him unwanted and abusive, Macalester ignored these complaints because they came from a male disabled student rather than from the female student.

37.     To the extent Macalester chooses, Macalester's harassment policy sweeps within its scope any behavior that a student may consider subjectively offensive.  Macalester

8

provides no standards for distinguishing unreasonable complaints from actual true threats of violence.  For example, it does not matter to Macalester administrators if a complainant's allegations of verbal "violence" are unreasonable.  It is enough if a complainant feels "intimidated" or complains of an "offensive educational or work environment."  This can trigger an intrusive Macalester investigation and "serious sanctions."

38.     Macalester's discrimination against Olson began with the manifestation of his bipolar disorder at the end of the school year  in 2013, when Olson had finished a full load of courses.  Macalester refused to allow Olson to take his finals.  He could not take them during finals week due to his confinement.  He was not allowed to complete these finals even though this was expressly allowed by Macalester's policy, and he lost 16 credits.

39.     Macalester's Director of Academic Programs and Advising Ann Minnick and Associate Dean of Students Lisa Landreman further barred Olson from campus until fall 2014.  Although Olson immediately began treatment, and that treatment, as Macalester officials such as Landreman and others knew, required him to reduce his exposure to stress as well as his courseload, Macalester forced Olson into a one-year leave of absence.  Olson reasonably requested that he be allowed to take a reduced load of two courses.  What Olson requested, Macalester had also granted to other students who were not disabled.  Director Minnick and Associate Dean Landreman denied this accommodation.

40.     Only in spring 2020, amidst its processing of Jane Roe's complaint against Olson, and while stalling the processing of Olson's complaint against Jane Roe, did Macalester relent and grant the accommodation to Olson too, but only to then deprive him of his degree by wrongly expelling him one week before he would have graduated.

41.     Associate Dean Landreman is a typical Macalester official.  Her views are commonly shared throughout the disciplinary bureaucrats and Title IX Office of Macalester. Macalester's administration is manifestly biased against people like Olson, which it cloaks in euphemisms such as "social justice."

42.     In practice this means identifying students who need to be repressed on the theory that this will somehow help historically underprivileged groups.  In particular, Dean Landreman and Macalester's "social justice" administrators developed an ideology that targets the supposed "mistreatment, bias, and exclusion ... traced to the heterosexism" on campus.  This marks heterosexual relationships and male students such as Olson who are "heteronormative," as per se, suspicious.

43.     By virtue of his sex and sexual orientation, Macalester bureaucrats like Landreman have redefined Olson and individuals like him as an inherent problem by virtue of their identity.  Landreman writes, "Like other oppressions, heterosexism is systematic and operates in our daily lives, both consciously and unconsciously."

44.     Disabled students are notably absent from Landreman's "social justice" campaign; to the contrary, defined as a "heteronormative" male student, Olson was identified as a threat from which the campus somehow required protecting.

45.     Another way in which Macalester discriminated against Olson was to deny him counseling services on campus, which he needed and reasonably requested for his ongoing treatment.

46.     Macalester maintains a psychological treatment and counseling support center called the Laurie Hamre Center for Health & Wellness.  This center employs PhD licensed

10

psychologists and PsyD licensed psychologists on staff as well as other professionals. In fact, Olson's current treating psychiatrist, Dr. Henry Emmons was a former director of Macalester's counseling center.

47.     The center has no fewer than 23 staff, including a consulting psychiatrist, who serve a student body of approximately 2000 students, although the average ratio of mental health professionals to students as reported in the National Survey of Counseling Center Directors is 1 to 1,600.

48.     The center also maintains a "Sexual Violence Prevention Education" office dedicated to the kind of "social justice" campaigns preached by Associate Dean Landreman and Macalester's other disciplinary bureaucrats. But being male and a so-called "heterosexist" with disabilities is not one of the privileged identities that Macalester seeks to support.

49.     Olson was denied services by the center.

**D. Ian Olson and Jane Roe's Consensual Heterosexual Relationship**

50.     Ian Olson met Jane Roe during the fall of 2018. They began dating and their relationship quickly became intimate. Their relationship was entirely consensual. At no time did Jane Roe ever accuse Olson of non-consensual sexual relations until long after she left Macalester and had to respond to his Title IX complaint against her.

51.     Olson was honest with Jane Roe about his mental health condition from the start. Olson also disclosed that one manifestation of his illness was the symptom of "pressured speech."

52.     Olson has worked with his treating professionals to develop mechanisms for coping with stress and controlling or avoiding pressured speech.  In particular, he always tries to remove himself from situations in which he is placed under pressure before losing emotional control.  This is why Olson's apartment was so important for him; it was a refuge to which he could withdraw in the face of stress.

53.     Another coping mechanism Olson uses is to grab a pillow and muffle his outbursts by screaming into the pillow.  Jane Roe as well as Macalester were aware of this practice used by Olson and understood it to be a harmless coping technique developed with his treating professionals.

54.     Before Olson and Jane Roe began their romantic relationship, Olson told her that there would be times when he needed to be alone, when his mental illness prevented him from being with her.  Jane Roe acknowledged Olson's special needs and agreed to work with him to help him through such episodes.  Macalester also knew that Olson had informed Jane Roe of these conditions of their relationship.

55.     At no point did Jane Roe lack means to find and rent her own residence while enrolled at Macalester.  Yet, very early on, Jane Roe pressured Olson to allow her to move in with him, claiming on various occasions that she "didn't have anywhere else to go" and that he owed this to her.  This was one of the early signs of Jane Roe's manipulation of Olson.

56.     She moved in many of her belongings before the school year ended in May 2019 before departing for the summer.  When school began in the fall 2019, Jane Roe planned to live in Olson's apartment.

57.     At all relevant times, Olson was the sole leaseholder of the apartment.  He also acted as building caretaker/groundskeeper at the apartment building in St. Paul.  There have never been any complaints about Olson's behavior from other tenants or complaints from his landlord.

58.     In the summer of 2019, Jane Roe and Olson managed a long-distance relationship.  In August 2019, Olson drove to Connecticut to meet Jane Roe in New Haven so they could take a leisurely road trip back to Macalester using his car.  When they arrived in St. Paul, Jane Roe moved in with Olson. She resided with Olson as a subletter.

**E. Olson and Jane Roe's Relationship Sours**

59.     Olson and Jane Roe's relationship soured immediately after their summer road trip.  This cohabitating arrangement did not work out.  By mid-August 2019, Olson had repeatedly asked Jane Roe to leave.  Yet Macalester condemned Olson for his repeated attempts to get Jane Roe out of his apartment as "stalking" and "hostile environment harassment."  To Macalester, a male student creates a hostile environment for a female student by trying to get her to leave his own apartment and refusing to live together with her.

60.     Olson first asked Jane Roe to leave his apartment on or around August 20, 2019.  She refused.  Olson was not able to convince Jane Roe to leave until October 28, 2019.  Once she left, she immediately started filing complaints against him, and she characterized Olson's efforts to get her to move out as "sexual violence" and "harassment."  In fact, Jane Roe only complained to Macalester's Title IX Office after Olson, in

13

desperation, informed her that he was thinking of filing a Title IX complaint himself in order to force her to leave.

61.     In another incident, Olson asked and then demanded that Jane Roe get out of his car, which she refused to do.  Their argument escalated.  Eventually, Jane Roe got out of the car at the south end of Macalester's campus, a few blocks from his apartment.

62.     Macalester found Olson responsible for "stalking" Jane Roe for, among other things, telling her to remove herself from his apartment and also for telling her to get out of his car.

63.     Jane Roe's complaint alleged that Olson was violently jealous, abusive, and threatening.  However, as their relationship soured, she began to verbally and emotionally abuse Olson: accusing him of refusing to have sex, threatening suicide, and suggesting that Olson was impermissibly interested in other women.

64.     She also texted Olson on October 4, 2019:

stupid fucking hypocrite

All your shit I put up w

and you don't want me over this

Seems like a fragile fucking want don't you think, genius?

[…]

You and your fucking pride

What is it, baby, did you meet someone?

Another, what was it, stubborn, fighty, dark-haired little girl? w a tighter waist?

Did I get them all?

14

You and your fucking pride

Oh sorry I forgot, your fucking incapable of not oversexualizing your girlfriends

my mistake

65.     At another point she texted him:

You don't like the way I look, the way I dress

You think I look bad and always have

[…]

you're bored of looking at my body

you don't want to have sex w me.

66.     Jane Roe knew, and Macalester knew that she knew, that Olson was vulnerable to pressure, loud noises, and verbal taunts.  She knew these behaviors toward Olson triggered his psychiatric symptoms.  Jane Roe knowingly screamed at Olson, "why don't you hit me, Hit me!  Hit me!  Hit me! … "

67.     Jane Roe would yell and cry at the top of her lungs at Olson.  Jane Roe demanded that Olson "look at me" and became irate if he did not.  She dared him to "throw my stuff in the dumpster" and destroy her belongings.

68.     She also threatened to throw out his medications, on which he depends.

69.     Multiple times, Olson pleaded with Jane Roe to calm down, leave him alone, or at least allow him to remove himself.  She responded by accusing him of "ignoring" her.

70.     Jane Roe followed Olson through his apartment continuing to yell and cry at Olson.

15

71.     For Olson, his psychiatric condition quickly made it impossible to cope with the extreme stress of the situation.  He had no place to go to gain stability and regain emotional control of himself in the face of Jane Roe's onslaught.

72.     A text message string from August 20, 2019 illustrates the early and irreparable breakdown of their relationship.  Olson left his apartment in the morning and stayed away all day to get away from Jane Roe.  He sought refuge on Macalester's campus, its library, and in his studies, where he had always felt safe.

73.     Although Jane Roe had activities during the day, she skipped them in order to squat in Olson's apartment.  This ensured he could not come back to be there alone.  She then blamed him for "abandoning" her.  At one point she accused Olson, "you'll leave me homeless."  "Threatening" to leave Jane Roe "homeless" (i.e. not allow her to be a squatter) was also later used by Macalester as evidence of his harassment *of her*.

74.     While Olson fled from Jane Roe during the day of August 20, 2019, she continued to contact him by instant message.  She told him, "I can't just keep staying here," that is, in Olson's apartment.

75.     Jane Roe even accused Olson: "you leftto [sic.] be cruel to me."

76.     But when Olson repeatedly asked her to vacate his apartment, Jane Roe responded, "Nothing is real  I don't think any of it is real."  She then accused him, "you yelled at me that's all you did yelled and ignored me"—even as she repeatedly ignored his request that she leave and move out of his apartment.

77.     Olson had already decided that he and Jane Roe needed to separate so he could regain a private place to live.  He wrote to Jane Roe, "Can we re-explore the option

where you're gone." Jane Roe refused. She simply said, "You just keep hurting me"--apparently by rejecting her and asking her to move out. She protested, "I don't have anywhere to go." Olson offered: "OK  Well I saw a nice sublet posted td for 351 a month."

78.     Jane Roe then resorted to threatening suicide, saying, "I can't live like this," and after Olson answered, "Yeah me either," she responded:

> I need to be dead you just keep hurting me and hurting me then saying you didn't mean it but not saying what you mean

What Olson meant was clear however. He wanted Jane Roe to vacate his apartment.

79.     Olson tried to reassure her: "you don't need to be dead  don't say that." Yet Jane Roe threatened suicide repeatedly if he would not submit to her demands for attention and her demands that he continue to allow her to live in his apartment.

80.     Olson asked Jane Roe to move out throughout the day, begging her at one point, "Can you please construct a healthy environment and leave me out of it." In fact, he asked her to leave *over 50 times*.

81.     But after blaming Olson for "le[aving] me here all day," Jane Roe reversed field and threatened to lock Olson out of his own apartment. "I have work in the morning and nowhere to go, take your medication and go," she told him. During this exchange, she further blamed Olson for not finding her a place to live. He began writing in all caps: "I AM ASKING YOU TO LEAVE I AM ASKING YOU TO LEAVE" over and over again.

82.     Jane Roe intermingled threats of suicide with taunts, like: "Find yourself a place or come here and strangle me" or "come here and rip me off the bed and throw me out in the hall."

83.     He pleaded with her to leave.  But Jane Roe once again complained that Olson did not pay enough attention to her, "I'm just abused and hurt and you can't look at me."

84.     Macalester knew—as did Jane Roe—that this kind of abuse is extremely disruptive to individuals with Olson's disabilities.  Victims who suffer symptoms of bipolar disorder and autism spectrum disorder need and crave social stability and order.  They also need private space, even in loving relationships, to which they can retreat, be alone, and allow their ordered thought processes to return.

85.     Jane Roe's behavior toward Olson was calculated to trigger his symptoms of pressured speech and loss of control over his psychiatric condition.  Once his ordered world began to lose coherence, Olson spiraled out of control.  Jane Roe intentionally left Olson with no way out of this spiral.

86.     When he brought Jane Roe home to visit in early 2019, Olson's mother noticed her impact on her son.  Jane Roe was jealous of time Olson spent with his mother, with whom he is very close and who has helped him through his mental illness.  Jane Roe forced Olson to sneak time to speak alone with his mother in his mother's own house.  When Jane Roe discovered Olson speaking alone with his mother, this inevitably provoked another round of abusive accusations that Olson would not pay sufficient attention to *her*, and Jane Roe yelled at Olson in his mother's own house.  Jane Roe also became angry when Olson tried to put on a necklace, which resulted in an "argument" that forced Olson to leave the house to escape Jane Roe's abuse.  He was so upset that he was not able to pull himself together to attend his mother's birthday party later the same day, which had been the

purpose of their visit.  Although Olson's mother was a direct witness to Jane Roe's abusive behavior toward Olson, Macalester's Title IX Office refused to interview her.

87.     To maintain his privacy and because Jane Roe refused to vacate his apartment, Olson began using the chain lock on his door to lock her out.  Because Olson had given Jane Roe a key to the apartment, this was the only way he could think of to keep her out when he needed to be alone.  Jane Roe removed the lock and disposed of it, claiming "I don't know where it is."  Macalester used this, too, as evidence that Olson had harassed and "stalked" Jane Roe.

88.     Olson became desperate to change his living situation.  At some point in the early fall 2019, he raised the possibility with Jane Roe that he would have to submit a complaint to Macalester's Title IX Office in order to get his apartment and his life back.  He also discussed legally evicting her.

89.     In response, on or around November 6, 2019, Jane Roe texted Olson threatening to *report him* because he did "not get the luxury of an education at Macalester."

90.     This was a pattern of abuse in relationships Jane Roe had with male students at Macalester.  Prior to dating Olson, Jane Roe had a relationship with the student BL.  When their relationship also faltered, she threatened to report him to the Title IX Office to "end his education" via a Title IX Complaint.

91.     Jane Roe wrote to Olson, pleading for his sympathy as she broke up with BL: "Can emotional abuse cause cancer? … I'm okay also, broke up w [BL] a few days ago & am doin good but gdamn did he try n do a number on me …"  And after claiming that BL had hurt her, she added, "But mb one day it'll all hit & kill him … Dude give me like a scenario

19

in which I'd feel bad about fuqing [sic.] [BL] up … like if his mom had just died?" And when Olson asked, "You mean fuqing him up physically or emotionally or how … If you fuq him up physically he'll recover, you'll go to prison, he'll win." Jane Roe responded, "Physically fighting him  Do you think I'd go to prison  I'm not interested in his emotions he like doesn't have those."

92.   Macalester's Title IX Office refused to investigate Jane Roe's pattern of abusive behavior, even when asked to do so by Olson.  BL was never interviewed.

### F. Jane Roe's Complaints Against Olson

93.   Jane Roe made good on her threat to report Olson.  On or around November 6, 2019, Jane Roe initiated a complaint with Macalester's Title IX Office.

94.   Jane Roe alleged that Olson had committed sexual harassment, domestic violence, stalking, and the vague, catchall category that Macalester fashions, "hostile environment harassment."

95.   Olson's conduct, verbal or otherwise, was directed toward ending his relationship with Jane Roe, making sure she did not interfere with access to his medications, convincing her to vacate *his* apartment, and, in one case, persuading her to get out of *his* car.  Yet, according to Macalester, this too fit the definition of harassment, stalking, and domestic abuse.

96.   Macalester immediately  issued a No Contact Directive ("NCD"):

> This NCD is bilateral which means [Jane Roe] will receive the same instructions. Effective immediately and until further notice, you are to have **no contact** whatsoever with one another. This includes, but is not limited to, in-person, electronic, telephonic, social media, *or contact by third-party*. Macalester College is a small campus and there may be incidental

20

contact. The College expects you to exercise your best, good-faith efforts to adhere to the terms of this NCD.

(Emphasis added.)

97.    Macalester's NCD also included an unambiguous statement concerning retaliation:

> Macalester College **strictly prohibits retaliation against any individual who** makes a good faith report of a potential violation of College policy, who supports another person's report, or who **acts as a witness in any investigation into a complaint**. This includes complaints of general harassment and other behaviors that may be disruptive to the educational environment fostered by Macalester. Any concerns of retaliation should be reported to the Interim Title IX & Bias Harassment Coordinator, Dion Farganis. **The College will take appropriate action against any individual who retaliates** against another person in violation of this policy. Retaliation includes, but is not limited to, any form of intimidation, reprisal, or harassment.

(Emphasis added.)

98. Macalester also promises:

> **Please note, this NCD is being established to prevent any escalation of tensions and/or other concerns that have been present between you and [Jane Roe].** *This NCD does not EXPRESS OR IMPLY that any disciplinary action has been or will be initiated. The College's interest, here, is facilitating an environment where you both can maximize the opportunities and experiences available at Macalester. Alternatively stated, this is NOT disciplinary in nature and, subject to compliance with the terms above, will not become part of your record or file with the College.*

(Emphasis in original.)

99.    Olson strictly abided by the terms of the NCD and in fact welcomed the NCD as relief from Jane Roe's torment, believing (mistakenly) that Macalester would enforce the NCD equitably.  However, over the course of Olson's investigation and his

reports to Macalester of Jane Roe's harassment and abuse, Macalester consistently breached the promises in the NCD.

100.    Macalester allowed Jane Roe to freely interfere with Olson's education and escalate tensions with him that interfered directly with his education and his access to a support network.  Macalester allowed Jane Roe to retaliate against Olson by undertaking a writing campaign to ruin his reputation among his Macalester friends and associates and among individuals far beyond the college.

101.    Essentially, Macalester made the NCD into a license for Jane Roe to continue her torment and retaliation against Olson for a bad breakup.

102.    On or around November 7, 2019, Jane Roe filed for an Order for Protection ("OFP") in the Ramsey County District Court.

103.    Jane Roe alleged abuse such as "he [Olson] would … hit other things, punch things, throw things, destroy my stuff."  Yet she alleged only one incident in which he allegedly caused bruises to her "wrists and arms," which photos provided by Olson have proved to be untrue.  The photos show Jane Roe to have no bruising at the times she claimed to have them.  In addition, other evidence showed that Jane Roe falsely represented bruising.  Macalester excluded this evidence.

104.    Jane Roe also accused Olson of "[p]icking me up and throwing me around.  It did hurt."  She also claimed that she had slept in the bathroom of Olson's apartment on one occasion "because it was the only room that locked."   She did not mention that she had destroyed the lock which Olson had put on the door to protect himself.

22

105.    Jane Roe also claimed "emotional and psychological abuse" consisting of her own "paranoia." Jane Roe argued that Olson was abusive because he "accused me of being self-victimizing and often bragg[ed] about his ability to charm…."

106.    Other alleged incidents included accusations that Olson: "… took this poem [that she liked] and wrote a really sick version of it on his blog…"

107.    Jane Roe later alleged to Macalester that Olson threatened to throw all of her belongings in a dumpster to evict her, but in state court she did not indicate that any of her belongings had ever been disposed of in this way.

108.    Jane Roe filled out a court form which asked whether she received "medical treatment … for any injuries." Jane Roe checked the box for "No." Jane Roe received no injuries, despite her later protestations that she did.

### G.  Macalester's Title IX Policy

109.    Macalester has promulgated its Sexual Misconduct Policy ("Title IX Policy") ostensibly to comply with Title IX of the Education Amendments of 1972 ("Title IX") and the Violence Against Women Reauthorization Act of 2013 ("VAWA").[2]

110.    Macalester's compliance with these laws includes, but is not limited to, the implementing regulations of the Clery Act. These include, among others, 34 C.F.R. § 668.46(k)(3)(i)(B)(3) (compliant policy shall "[p]rovide[] timely and equal access to the … accused … any information that will be used during informal and formal disciplinary meetings and hearings") as well as the regulations promulgated to implement Title IX, 34 C.F.R. § 106, et seq.

---

[2] Available at https://www.macalester.edu/titleix/sexualmisconductpolicy/

111.    At all times relevant to this complaint, Dion Farganis was Macalester's Title

IX Coordinator.  Farganis hailed from the Minneapolis law firm Lathrop GPM and from the

closely associated education services firm TrainED.  Throughout the process, as Macalester

knew, Farganis ensured that only attorneys from his firm were hired to conduct Macalester's

investigations.

112.    Macalester promises, in a "Notice of Non-Discrimination" in its Title IX

Policy, not to discriminate on the basis of disability or sex.

113.    Macalester's Title IX Policy also promises:

> The College will promptly and equitably respond to all reports of sexual
> misconduct in order to eliminate the misconduct, prevent its recurrence,
> and address its effects on any individual or the community.

Thus, Macalester promises prompt and equitable responses to ***all reports*** of sexual

misconduct, meaning that it will not treat reports made by accused male students differently

from reports lodged by alleged female victims.

114.    Likewise, Macalester's Complaint Resolution Process[3] promises:

> All proceedings involving a sexual misconduct complaint will provide a
> prompt, fair, and impartial investigation and resolution. Proceedings will be
> conducted by individuals who receive annual training on the issues related
> to sexual harassment, sexual exploitation, sexual assault, domestic violence,
> dating/intimate partner violence, stalking, how to conduct an investigation,
> and decision-making processes that protect the safety of all and promote
> accountability. In addition, proceedings will be conducted by individuals
> who do not have a conflict of interest or bias for or against the
> complainant or respondent.

115.    Macalester promises students that they have protected "Rights of the

Complainant and Respondent," which include but are not limited to:

---

[3] Available at https://www.macalester.edu/titleix/reporting/.

- appropriate support from the College;

- privacy to the extent possible based on applicable law and College policy;

- information on the policy and procedures;

- equitable procedures that provide both parties with a prompt, *fair and impartial investigation and resolution* conducted by officials who receive annual training on conduct prohibited by the policy;

- notice of the allegations and defenses and an opportunity to respond; [and]

- *to be free from retaliation*;

(emphasis added.)

116.     Macalester purports to provide both the accused (called "Respondents") and Complainants in its Title IX process with "interim actions and protective measures."

117.     This means, "The College will make accommodations and provide protective measures for an individual who believes they have experienced sexual misconduct, if requested and reasonably available.…  The College may also provide accommodations and resources to others involved in the process, including those adversely affected by allegations of sexual misconduct, if requested and reasonably available."

118.     In practice, and as demonstrated by Macalester's selective enforcement of its NCD, Macalester tailors "interim actions and protective measures" only to protect alleged female victims and not accused male students.  And when female students such as Jane Roe are accused, Macalester does not enforce the alleged protections, including, without limitation, by denying meaningful accommodations to male complainants like Olson.

119.     Another example of Macalester's selective and discriminatory treatment of Olson is its enforcement of rules against "retaliation."

120.    The rules against retaliation are set forth in the Title IX Policy, which

Macalester reproduced in full in its NCD issued to Olson as quoted above.   Retaliation is

defined by Macalester to protect complainants as well as the respondents because

respondents are clearly witnesses in a Title IX process as defined under the policy.

121.    Macalester promises action when a party retaliates:

> The College will take appropriate action against any individual who
> retaliates against another person in violation of this policy or who violates
> interim measures or sanctions.

> When the College receives a complaint of retaliation or of violations of
> interim measures or sanctions, the Title IX Coordinator may exercise
> discretion to determine an appropriate responsive process based on the
> facts and circumstances.

122.    On information and belief, Macalester only enforces its anti-retaliation rules

against accused male students and does not enforce its rules against female students alleging

to be victims or even when the female students are accused by male students.

123.    Macalester has developed procedures for addressing sexual misconduct

allegations in its Title IX Policy.  When a complaint is submitted:

> In most cases, the first step of the complaint resolution process is a
> preliminary meeting between the complainant (the person filing a
> complaint with the College under the Sexual Misconduct Policy) and the
> Title IX Coordinator or the Title IX Coordinator's designee(s). The
> purpose of the preliminary meeting is to gain a basic understanding of the
> nature and circumstances of the complaint; it is not intended to be a full
> investigation interview.

Macalester's policy, by its plain language, does not require a preliminary in-person meeting,

however.

124.    It is clear and courts have consistently held, however, that Macalester has an

independent obligation to investigate allegations of sexual misconduct, regardless of whether

26

a student has complained, asked the University to act, or formally identified the harassment as "discrimination."  In practice, however, Macalester follows this independent obligation only with regard to complaining female students and not with regard to male students such as Olson.

125.    Macalester invokes its obligation to pursue allegations against accused male students.  But alternatively, Macalester invokes formal procedural rules to block and delay allegations made by male students against female students.

126.    Once the Title IX Office receives a complaint of sexual misconduct, the Title IX Coordinator of Macalester or her designee tries to meet with the respondent (i.e., the accused),

> … to notify them of the complaint and alleged policy violations that are being investigated; provide an explanation of the process; explain the importance of preservation of evidence; describe any interim actions or protective measures that have been put in place that directly relate to the respondent (i.e., no contact directive); provide information about on- and off-campus resources; in cases involving allegations of sexual assault, dating/intimate partner violence, domestic violence, or stalking, explain the right to have an advisor; and explain the College's policy prohibiting retaliation.

127.    Macalester maintains a "formal resolution" process that uses a modified version of what is known as the "single-investigator" model:

> The Title IX Coordinator or the Title IX Coordinator's designee(s) will designate one or more trained investigators. The investigation will be thorough, impartial, and fair, and all individuals will be treated with appropriate sensitivity and respect. The investigation will be conducted in a manner that is respectful of individual privacy concerns. The investigation will typically include interviews with the complainant, the respondent, and any witnesses; these interviews may be audio-recorded. As part of the investigation, the College will provide an opportunity for the both the complainant and respondent to advise the investigator(s) of any witnesses they believe should be interviewed, and other evidence they believe should

be reviewed by the investigator(s). The interviews will be supplemented by the gathering of any physical, documentary, or other evidence, as appropriate and available. At the conclusion of the investigation, the investigator(s) may prepare a report setting forth the facts gathered. The investigator(s) will compile an investigation file, which shall consist of any information, documents, recordings, or other evidence that will be provided to the adjudicators. The investigation file will be forwarded to the Title IX Coordinator for review and the Title IX Coordinator has the discretion to ask the investigator(s) for clarification, additional investigation, and/or to have information removed or redacted from the investigation report.

The Title IX Policy calls for the appointment of an investigator to canvass the parties for relevant witnesses and collect evidence, including physical, documentary, or other evidence "as appropriate and available."

128.    The single-investigator method of campus adjudication has been universally condemned, even by victims' advocacy organizations that promote "risk management" for university administrations, such as the Association of Title IX Administrators (ATIXA).

129.    In fact, the single-investigator model has been banned under the newly promulgated Title IX regulations that effective on August 14, 2020, and it has already been banned in the Sixth Circuit and Third Circuit, which both require cross examination and live hearings before a school may condemn a student as guilty of something as serious as sexual misconduct.  The Third Circuit imposes this cross examination obligation on private as well as public universities.

130.    Title IX requires the school and any investigator to include exculpatory as well as inculpatory evidence under guidance issued by the Office for Civil Rights of the Department of Education, including the accused's witnesses.

131.    In Olson's case, Interim Title IX Coordinator Farganis appointed Sara Duniway from his law firm as Macalester's single investigator.

132.    Duniway is an attorney who holds herself out as primarily "specialized" in working with tax-exempt organizations as an advisor on corporate governance and compliance, strategic planning, mergers and acquisitions, and program design.

133.    Attorney Duniway does not hold herself out as "specialized" in the investigation of sexual assault.  She is associated with Title IX Coordinator Farganis's firm TrainEd and was essentially his boss as former Managing Partner of Lathrop GPM.  In other words, Farganis took this opportunity to assign work to a powerful partner in his own law firm, for which the firm charged hefty legal and "investigation" fees.

134.    Once Macalester's single investigator concludes an investigation, Macalester's Title IX Policy then provides:

> Upon completion of the investigation, the Title IX Coordinator will assign the appropriate College authority and a second designee from the Title IX or Bias & Harassment Team to adjudicate the complaint.  When the respondent is a student, the appropriate College authority is the Vice President for Student Affairs or designee; when the respondent is a faculty member, the appropriate College authority is the Provost and Dean of the Faculty or designee; when the respondent is a member of the staff, the appropriate College authority is the Director of Employment Services or designee; and when the respondent is the President of the College, the appropriate College authority is the Chair of the Board of Trustees or designee. If the appropriate College authority is the respondent or the complainant, either of the other two administrators designated will assume the responsibility of adjudicating the complaint. The College will strive to complete a prompt, thorough, fair and impartial adjudication. The adjudicators will review the investigation file and any additional information provided by the complainant and respondent after the parties' review of the investigation file, as applicable. This information will be used by the adjudicators to determine whether it is more likely than not (a "preponderance of evidence" standard) that the respondent violated the

29

policy, and they will impose remedies and/or sanctions as necessary to end the misconduct, prevent its recurrence, and address its effects.

135.    There is thus no opportunity to confront witnesses.

136.    Macalester's default procedure is to conceal evidence from the accused. However, only for cases involving sexual assault, dating/intimate partner violence, domestic violence, and stalking, Macalester allows students to review the single investigator's file and report.  At no point, however, does an accused student have any meaningful right to cross-examine witnesses or even to submit written questions to be submitted to witnesses

137.    Even to accused students who qualify to see the evidence against them, Macalester restricts "review" of the investigation report.  Macalester grants the accused only specific times to view the report and only in the presence of another Macalester bureaucrat. This extreme restriction on access is nowhere stated or required in Macalester's Title IX Policy.

138.    Macalester limits access in such a way to make access meaningless, just as its limitation on the accused's response to "2000 words" renders meaningless his ability to respond, especially for a disabled student like Olson.  Macalester also forbid Olson to take notes or to copy the file.

139.    In addition, Macalester reserves the right to redact extensive sections of the file although it is clear that the file, in its entirety, is the accused's educational record to which he is entitled to copies under the Family Educational Rights and Privacy Act.

140.    Olson requested his complete FERPA file on June 10, 2020, and Macalester had 45 days – that is, until July 25, 2020 -- to provide Olson with that file.  Macalester refused and, to date, has still not provided Olson's educational file.  Instead, Macalester

offered Olson access on the same terms that he was restricted to viewing his investigation file, only in the presence of a Macalester bureaucrat, and without allowing him to make copies or notes.

141.    Macalester also maintains a so-called "Bias & Harassment Team" that promises to "create a community free of any form of harassment."

142.    Given Macalester's conception, among other things, that verbal conduct is "violence" and "heteronormative" behavior is prejudiced, Macalester's Bias & Harassment Team seeks to enforce rules far beyond what antidiscrimination laws such as Title VI, Title VII, and Title IX require.  As Macalester admits, "Bias-related incidents … do not always result in unfair treatment that violates nondiscrimination laws."

143.    This policy, like Macalester's Title IX policy, is also enforced selectively.  Jane Roe's discriminatory conduct against Olson on the basis of his disability and sex is not the kind of "bias -related incident" that Macalester cares about.  Rather, Macalester only took effective action and imposed sanctions against Olson based on Jane Roe's allegations of discriminatory conduct.

144.    In Olson's case, Macalester assigned two campus judges to review the Duniway Investigation Report.  First, Macalester assigned Eily Marlow, a "Program Associate for Vocation and Reflection" in Macalester's "Civic Engagement Center." Macalester also appointed Bob Graf, Director of Employment Services.

145.    After a student such as Olson is condemned and found guilty, Macalester provides for a limited appeal process so long as the student appeals within 10 days following the notice of outcome.  However, the appeal is limited to the following enumerated grounds:

- a procedural error occurred that substantially affected the outcome of the process;

- the decision was arbitrary and capricious or violated academic freedom; there has been discovery of significant new factual material not available to the Investigator that could have affected the original outcome;[4]

- or the sanction or other response by Macalester under the formal resolution process was excessively severe or grossly inadequate.

## H. The Unfair and Selective Enforcement of Title IX against Ian Olson

*1) Jane Roe's Complaint against Olson*

146.    On November 15, 2019, only nine days after Jane Roe's Complaint,

Macalester's Title IX Office sent Olson formal notice (the "Notice") alleging:

> From January 2019 through November 5, 2019, including but not limited to October 2, October 19, October 26, October 28, and November 5, in various locations, including in your shared apartment, while in a dating relationship with [Jane Roe], you engaged in unwelcome verbal and nonverbal conduct of a sexual nature, made anti-Semitic comments, engaged in acts of violence causing or threatening to cause physical harm to [Jane Roe], made threats of violence against [Jane Roe], destroyed [Jane Roe's] property, and engaged in other physical and verbal conduct that caused [Jane Roe] to fear for her safety.

147.    Macalester's Notice charged Olson with the following violations of the

school's Title IX Policy:

- Sexual Harassment (§B)
- Domestic Violence (§D)
- Stalking (§E)
- "Hostile Environment" (§5.22)

Macalester, through Farganis, promised in the Notice: "the investigation will be thorough,

impartial, and fair, and all individuals will be treated with appropriate sensitivity and respect."

---

[4] The Title IX Policy further limits the introduction of new factual material, where "intentional omission of factual information by the appealing party is not a ground for an appeal."

148.    The effect on Olson's mental well-being was immediate and dramatic.  Olson wrote to Fargonis on November 18, 2019: "I am under a significant amount of pressure today and feel that I am buckling mentally/emotionally … I've spent the past few days crying & vomiting just from the anxiety of it all & haven't been taking great care of myself. There is no situation I can foresee where I am anything but a burden to others. I feel like to be ex-communicated from campus is unfair and unnecessary. And based on the fact that I had to demand [Jane Roe] finally leave my apartment, and that I'm living with these disabilities, it seems almost like a form of wrongdoing is taking place against me here … Last night I was considering checking into a psych ward on account of these stressors…."

149.    Macalester's Title IX Office made no response.

150.    Olson wrote the next day after receiving the Notice to Associate Dean of Students Andrew Wells (November 19, 2019): "As things are laid out right now [Jane Roe's] legal actions are impacting my health and I'm doing my best to accept that burden.  This is neither realistic, healthy, nor fair.  But there is nothing I or we can really do about it.  Living with bipolar disorder and autism means having to accept the consequences of one's 'crazy' behaviors from time to time but this current situation does honestly feel like more than my spirit can handle.  There is no ongoing threat to [Jane Roe] and I wish there were a healthy way to step-back or step-down from this level of institutional involvement. I want the best for [Jane Roe's] school stuff and wellbeing, but am also worried about myself…"

151.    Already on November 9, 2019, and in clear violation of the NCD, Jane Roe began to text and email Olson's friends and members of his support network alleging that Olson was a "domestic abuser" and claiming that her life "was in immediate danger."

33

152.    By email and by text message of November 9, 2019, Jane Roe spread these and similar allegations to Olson's close friend Brianna Morseth.  Jane Roe continues this campaign to malign and defame Olson to the present day.  Olson has become aware that Jane Roe contacted at least the following individuals:

Sierra Servi Sereno

Kava Garcia Vasquez

Michaela Sharp

Juliette Perinne Myers

Anika Kulander

Brianna Morseth

153.    Olson repeatedly informed Macalester of Jane Roe's abuse and continuing retaliation against him, including but not limited to the following days:

- November 21, 2019: Olson informed Macalester "since at least 11/9/19, [Jane Roe] has been contacting people in my personal & professional networks about the ongoing case in a sense that is absolutely retaliatory.  A former colleague from academic work outside of Macalester has just reached out to let me know that [Jane Roe] emailed them …"

- December 27, 2019: Olson informed Macalester, "… The thing I'm afraid of is more retaliatory action from [Jane Roe]…. [Jane Roe's] lawyer threatened to take action if I filed a Title IX against [Jane Roe] and even wanted to stipulate I waived my right to do so… Since evicting [Jane Roe] she has harassed countless people in my life and her friends have been posting violent messages on Facebook."

154.    Macalester did nothing about Jane Roe's retaliation and harassment against Olson.

155.    In addition to BL, Olson provided the names of the following witnesses to

Macalester:

- Casey Doyle Olson (Olson's older sister who observed Jane Roe's abuse of Olson during visits to his familial home and also tried to help Olson evict Jane Roe).

- Eileen Doyle (Olson's mother and direct witness to Jane Roe's abuse of Olson who also, as a professional therapist, intervened to help Olson develop strategies to evict Jane Roe)

- Dr. Henry Emmons, Olson's treating psychiatrist

- Brianna Morseth (a direct witness to Jane Roe's retaliation against Olson)

- Harry Waters, Jr. (observed Jane Roe's behavior towards Olson over the 10-month relationship)

- Matthew Stern (Jane Roe's cousin and disability expert and Olson's friend who witnessed Jane Roe's abusive behavior during their relationship, including giving Olson shelter when Jane Roe would not vacate Olson's apartment)

- The witness JS (another target of Jane Roe's pattern of abuse whom Jane Roe also accused of being "racist" in class, causing him to cry)

- Marlon James (Professor and advisor to Jane Roe, who witnessed her harassment of JS).

- BL (an ex-boyfriend of Jane Roe who had suffered a similar pattern of abuse as Ian Olson).

156.    On information and belief, Macalester refused to interview the following

witnesses:

- BL

- Eileen Doyle

- Brianna Morseth

- Anna Singer

- Dr. Henry Emmons

- JS

- Marlon James

- Harry Waters, Jr.

*2) Macalester Slow Walks Olson's Complaint Against Jane Roe*

157.    Olson repeatedly brought Jane Roe's wrongdoing to Macalester's attention, including but not limited to communications on the following dates:

- November 18, 2019 to Farganis.

- November 19, 2019 to Associate Dean Wells.

- November 21, 2019 to Title IX Coordinator Farganis ("… follow[ing] up with you about filing my own title IX complaint. This is something that I would like to do")

- December 27, 2019 to Title IX Coordinator Farganis (notifying him of Jane Roe's vandalizing his front door lock and taking $600 worth of camera equipment).

- March 28, 2020 to Title IX Coordinator Farganis (complaining again of Jane Roe's "bigoted and ableist" abuse)

- April 3, 2020 to Title IX Coordinator Farganis ("[Jane Roe] spent months threatening, teasing, and trespassing upon a disabled adult [and] continuing to harass people from my personal and professional networks")

158.    Although Title IX Coordinator Farganis led Olson to believe that Macalester would take action promptly in response to his allegations, Macalester stalled. Macalester took "prompt" action only on Jane Roe's complaint against Olson.

159.    Farganis repeatedly told Olson that Macalester would delay investigation of Olson's complaint against Jane Roe until such time as Olson came in to speak with Title IX Coordinator Farganis personally—in breach of Macalester's independent obligation to investigate incidents of sexual misconduct.

160.    On November 19, 2019, Farganis responded that he believed Olson was "uncertain" about his complaint against Jane Roe and that the Title IX office needed "more specific information" to "determine what college policies, if any, might be involved."

161.    Four months later, on March 4, 2020, Macalester finally initiated a "Formal Complaint" against Jane Roe.  Olson met with Macalester Assistant Vice President for Student Affairs and Dean of Students Demethra Bradley.  By this time, graduation for Jane Roe was only two months away, and, once she graduated, Macalester would use this as a justification for canceling Olson's complaint against Jane Roe completely.

162.    Dean Bradley is a career administrator who has published books discussing "proof positive of the existence of elitist, white, male, middle-class bias and intellectual privilege in the academy [i.e. academic institutions like Macalester]." The antidote she advocates is to "stop gender bias," for which she gives the example of "challeg[ing] the hegemony of male-dominated chemistry departments in higher education."

163.    Dean Bradley is an exemplar of the "social justice" advocates with which Macalester stocks its administrative ranks.  Macalester puts them in charge of implementing policies such as the biased investigation and selective prosecution of Olson.

164.    Olson made the following allegations against Jane Roe to Dean Bradley:

- Jane Roe downloaded Ian's resume from a blog and started contacting individuals associated with Olson with harassing messages.

- Jane Roe refused to vacate Olson's apartment between August–October 2019.

- Jane Roe threatened to submit a Title IX complaint as revenge for evicting her and stated that she had "done this before to white men" (referring specifically to Macalester student BL).

- Jane Roe told Olson, "you're not right" and "you are insane" when Olson attempted to break up with her.

- Jane Roe threatened self-harm if Olson left the apartment or broke up with her.

- Jane Roe taunted Olson, demanding, "just hit me" or "get on with it," meaning striking her.

- Jane Roe's yelling and screaming interfered with Olson's relations with neighbors, causing one to knock on their door.

- Jane Roe became aggressive with Olson for refusing to engage in sex after medication caused his sex drive to wane dramatically.

- When Olson requested that Jane Roe cease sexual contact, she refused.

- Jane Roe threatened Olson to "lock him out" and leave his medication in the hallway if he asked her to vacate the apartment.

- Jane Roe removed the lock from Olson's door so he could not lock her out.

- On October 20, 2019, Jane Roe threatened Olson with a small knife, in addition to threatening him with her fist.

165.   Even after Olson's "Formal Complaint," however, Macalester dragged its feet against Jane Roe.  Farganis waited over three weeks, until March 30, 2020, to serve notice on Jane Roe, whereas he had served notice on Ian Olson within 9 days of Jane Roe's complaint

166.    To investigate Olson's complaint Farganis appointed a junior associate from his own firm, Caitlin Miles (now Caitlin Gehlen).  Following her appointment, Miles promptly announced she would be going on leave and had to finish her investigation of Jane Roe by June 17, 2020.

167.    On information and belief, where female students accuse male Macalester students of "harassment" and sexual misconduct based on allegations similar to those Olson made known to Macalester, Macalester consistently takes prompt action, as it did in the case of Jane Roe's complaint.  Macalester does not inform the female student that it needs "more specific information" to "determine what college policies, if any, might be involved."  And it does not appoint investigators who promptly announce that they must go on leave.

3) *Macalester Completes the Investigation Report against Olson*

168.    The same day that Macalester allowed a "Formal Complaint" against Jane Roe, March 4, 2020, Duniway completed her case against Olson and submitted an Investigation Report.

169.    Despite Duniway's compilation of facts intended to condemn Olson and despite Farganis' instructions to bifurcate any investigation against Jane Roe, the Investigation Report could not entirely exclude numerous details of Jane Roe's discriminatory abuse and harassment of Olson, including but not limited to the following:

- Jane Roe mocked Olson as "weird and scary, like Joker shit," using stereotypes of a criminal murderer-deviant as in Batman series to characterize Olson's disability.

- Jane Roe mocked Olson with comments like, "You're insane" when he asked her to vacate *his* apartment.

- Jane Roe monitored Olson's social media, including obtaining a copy of his resume, which she used to contact people in his network in order to harass him with accusations of "abuse," "sexual violence," and supposedly threatening Jane Roe's life.

- Jane Roe accused Olson of having two personalities, one normal person and one mentally ill person, playing on Olson's fear of being perceived as crazy.

- Jane Roe admitted removing the chain lock from Olson's door to prevent him from barring her from *his* apartment.

- Jane Roe threatened suicide, and engaged in other psychological manipulation, to get Olson to agree to allow her stay in his apartment.

- Jane Roe taunted Olson by begging him to "hit her" repeatedly.

- Jane Roe threatened to discard Olson's medications or throw them out into the hallway of his apartment building.

- Jane Roe refused to allow Olson privacy when he suffered from pressured speech and instead yelled at him, cried, and taunted him.

- Jane Roe repeatedly contacted Olson's friends and members of his extended support network to knowingly interfere and threaten Olson.

- Jane Roe refused to vacate Olson's apartment when he repeatedly told her he did not want to live with her.

- In the face of Jane Roe's torment, Olson divulged to Investigator Duniway that he had contemplated trying to get arrested just so he could go to jail and escape her behavior.

- Olson divulged to Investigator Duniway that he contemplated trying to get admitted to the hospital rather than continue cohabiting with Jane Roe.

- Jane Roe forced Olson to look for a place to stay with friends, even though she was staying in *his* apartment as a tenant at sufferance.

- Jane Roe continually harassed Olson with barrages of messages.

170.    Macalester refused to view Olson and Jane Roe's troubled relationship for what it was: a messy break up in which each student's actions were inextricably intertwined.

40

Instead, Macalester placed an artificial wall between facts implicating the male student Olson and those implicating the female student Jane Roe, in order to shield the latter and prejudice the former.

171.    On March 29, 2020, Farganis again informed Olson that "this complaint resolution process is focused on [Jane Roe's] complaint alleging that you engaged in conduct in violation of the policy…"  Thus Macalester refused to consider evidence of Jane Roe's harassment and abuse of Olson.

172.    Meanwhile, the sandbagging of Olson's Complaint against Jane Roe continued.  Farganis required Olson to provide an "updated complaint" on March 29, 2020 if he wished to proceed.  Macalester never required the female complainant, Jane Roe, to provide an "updated" complaint.

173.    One example of prejudice to Olson was exclusion of BL as a witness, despite the fact that this evidence established a clear pattern of abuse and malicious motive on the part of Jane Roe.

174.    Olson was also prejudiced by Macalester's approach to his disability.  Neither Investigator Duniway nor Title IX Coordinator Farganis informed themselves concerning Olson's mental illness or its manifestation in the symptom of pressured speech.

175.    Duniway made no effort to understand Olson's illness and merely relied upon Olson's attempts to describe his symptoms, which she and Macalester repeatedly put in scare quotes and characterized as mere excuses proffered for supposed misconduct and alleged "sexual violence."  Olson contacted DS and its coordinator Melissa Fletcher, seeking reasonable accommodations, but he was informed that DS could do nothing.

41

176.    On March 30, 2020, despite serving notice on Jane Roe of Olson's Title IX Complaint against her, Title IX Coordinator Farganis again informed Olson that statements concerning Jane Roe's abuse would be removed from the record: "Because we have not received an updated statement from you and it is now after 3:00 p.m., I will redact those sentences from your written statement and we will proceed with the rebuttal period."

177.    The "rebuttal period" is what Macalester calls the process of responding to the Investigation Report, but Macalester affords the student no meaningful opportunity to challenge or cross examine witnesses, not even by the submission of written questions, and limits any "rebuttal" to 2000 words (although Investigator Duniway's Investigation Report was approximately 250 pages long).

178.    Olson was only allowed to view the evidence and Investigation Report under the direct observation of a Macalester official, and only during limited hours when an official was available for approximately 1 - 2 hours.

179.    Macalester forbid Olson to make copies of the Investigation Report.  And despite requesting his complete education file under the Family Educational Rights and Privacy Act, Macalester still refuses to provide Olson with a copy.

   *4)   Macalester Condemns and Expels Olson while Rewarding Jane Roe with a Degree*

180.    On May 8, 2020, Macalester provided Olson with its Notice of Outcome (the "Judgment") finding him responsible on all charges, including "domestic violence" constituting "felony or misdemeanor crimes of violence"; stalking; sexual harassment; and "hostile environment harassment."  The decision was purportedly made by Macalester's adjudicators Graf and Marlow.

181.    Among the evidence condemning Olson, Macalester found it more likely than not true that

- Olson threw Jane Roe's possessions in a dumpster, although no lost possessions were ever identified or reported that were thrown in a dumpster.

- Olson threatened Jane Roe by asking her to leave his own apartment.

- Olson had threatened Jane Roe because Jane Roe complained, "I'm too scared to leave bc you'll leave me homeless."

- Olson locked Jane Roe out of his own apartment.

- Jane Roe threatened to throw his medications out.

- Olson would "look at her Facebook messages and get angry" and "peeked at Jane Roe's phone."

- Olson called Jane Roe names.

- Olson threatened to throw Jane Roe's belongings into the hallway to get her to leave his own apartment.

- Olson grabbed Jane Roe's wrists and held her down, which "inflicted fear of imminent physical harm, bodily injury, or assault" (although no charges of felony or misdemeanor assault as required for Macalester's definition of "domestic violence" were ever filed or proved).

- Olson required Jane Roe to find somewhere else to live.

- Olson forced Jane Roe to leave his own automobile.

182.    Macalester turned substantially similar events and actions with which Jane Roe tormented Olson as evidence that Olson "stalked," "abused," and threatened Jane Roe with "sexual violence."  For example, looking over Jane Roe's shoulder at her social media posts while they lived together, trying to convince Jane Roe to stay with her friends so that Olson

43

could be alone in his own apartment, or making disparaging comments about Jane Roe were all credited by Macalester against Olson as harassment of Jane Roe. Yet her substantially similar behavior was credited as a reaction to Olson and therefore caused by Olson.

183.    Macalester handed down its Judgment one week before graduation (which was to be May 16, 2020). Olson had completed enough credits to graduate, partly by acquiring transfer credits from St. Thomas University in St. Paul. He had struggled for 10 years to overcome his overwhelming psychiatric condition and complete his education, and with the draconian sanction of expulsion, Macalester deprived him of his entire tuition and his degrees one week before these would have been conferred.

184.    Meanwhile, Macalester permitted Jane Roe to graduate without incident, despite the open complaint, her ongoing retaliation against Olson, and voluminous evidence of her abuse of Olson.

185.    The Judgment, which Macalester also provided to Jane Roe, repeated Macalester's policy against retaliation.

186.    Following the Judgment, Jane Roe continued to contact and harass people in Olson's support network. Macalester remained unresponsive to Olson's demands that the Title IX Office take action to stop this retaliation. Macalester enforces retaliation policies only against accused and condemned male students and not against alleged female victims who retaliate against the accused, both during and after Macalester's process and in violation of the university's own rules.

   5)  *Macalester Denies Olson's Appeal*

187.    On May 27, 2020, Olson submitted an appeal.

188.    On July 9, 2020, Macalester denied Olson's appeal.

189.    Olson's appeal was decided by a Director of Accounting, David Berglund.

190.    By this time Macalester had conferred a bachelor's degree on Jane Roe.

191.    The appeal rejected Olson's argument that Macalester enforced its Title IX Policy selectively against him.  The appeal also rejected Olson's contention that Jane Roe had discriminated against him on the basis of his disability.

192.    The appeal rejected Olson's argument that a disabled individual with bipolar disorder was disadvantaged in any way by being forced to read and respond *in no more than 2000 words* to all the evidence and Macalester's Investigation Report of approximately 250 pages -- which Macalester never provided to Olson in electronic form or in hard copy.

193.    The appeal rejected Olson's contention that Macalester's refusal to interview his witnesses would have made any difference in the outcome.

194.    Above all, in rejecting Olson's appeal, Macalester insisted upon the right to separate Olson's allegations against Jane Roe, including her retaliation, harassment, and abuse of Olson, as irrelevant and unrelated to any wrongdoing Jane Roe alleged that Olson committed against her, including her direct discrimination against Olson.

195.    By this standard, Olson could only be found liable and expelled for discriminatory actions against Jane Roe; but none of Jane Roe's discriminatory actions against Olson could 1) undermine her credibility, 2) demonstrate her willful, conscious, and malicious discrimination against Olson, or 3) mitigate any sanction imposed on Olson.

196.    The Appeal also rejected photographic evidence Olson submitted demonstrating that Jane Roe, who submitted an undated photograph allegedly showing

bruising of her wrists, had never suffered bruised wrists.  Macalester repeatedly rejected and excluded photographic evidence that Jane Roe vandalized Olson's apartment, vandalism she admitted in the Investigation Report.

197.    Although Olson had not been on campus at any time during the spring 2020 semester and there was no evidence that he posed a threat to the "college community" at any time, including over the past 10 years of his struggle to complete his bachelor's degree at Macalester, Macalester justified the severity of his sanction "in order to protect the rights and personal safety of the complainant and the College community."

198.    Olson suffered and continues to suffer from suicidal ideation, depressive episodes, and the exacerbation of his psychiatric condition due to Macalester's wrongful decision and expulsion.  He has also suffered from the deprivation of his degree for which he worked for 10 years to complete despite his disability.

199.    Jane Roe continues to enjoy all the benefits of Macalester's conferral of her undergraduate degree.

   6) *Macalester Selectively Enforces its Title IX Policy by Dismissing Olson's Complaint against Jane Roe*

200.    Nominally, Macalester's Title IX investigation of Jane Roe continued after her graduation.  Olson provided the following evidence in addition to that brought forward in the Title IX investigation of Jane Roe's complaint against him:

- Jane Roe's abusive messages jealously berating Olson on October 4, 2019 just before moving out of his apartment: "All your shit I put up w  and you don't want me over this  You and your fucking pride  What is it, baby, did you meet someone?  Another, what was it, stubborn, fighty, dark-haired little girl? W a tighter waist?  Did I get them all?  You and your fucking pride  Oh sorry, I forgot, your

46

fucking incapable of not oversexualizing your girlfriends my mistake"

- Text messages in which Jane Roe complained, "you're bored of looking at my body   you don't want to have sex w me."

- Semi-pornographic pictures obviously taken by Jane Roe with her own smart phone as she posed in front of a mirror, proudly displaying self-inflicted cutting scars on her buttocks.

- Jane Roe's own semi-nude photos celebrating bruising and rough sex with Olson, including a pink lip stick-written message over her bruise, "thanks, daddy."

- Another suicide threat made by Jane Roe in order to get her way in disagreements, claiming to be an "in case I wake up dead here's what happened" message.

- Messages demonstrating Jane Roe's pattern of manipulation and emotional abuse of her ex-boyfriend BL, whom Macalester refused to interview, demonstrating that Jane Roe accused the ex-boyfriend of the exact same pretextual "abuse" and "intimate partner violence" that the Title IX Office credited in throwing Olson out of Macalester.

- Jane Roe's threats to "hit and kill" her ex-boyfriend, stating, "Dude give me a like a scenario in which I'd feel bad about fuqing [sic.] [the ex-boyfriend] up."

- Jane Roe's message in response to Olson asking, to dissuade her from resorting to violence against her ex-boyfriend, "You mean fuqing him up physically or emotionally or how"? in which Jane Roe responded, "Physically fighting him  Do you think I'd go to prison"?

201.   This and other evidence substantiated everything Olson had told Macalester all along.  Jane Roe had a pattern of emotional abuse directed toward her intimate partners, whom she then blamed for her abuse.  It also showed she was inclined to violence, and cast doubt on her complaints of bruising as abuse, because she openly celebrated rough sex in her relationship with Olson.  It also showed her overt abuse of Olson.

202.    The evidence showed Jane Roe had engaged in the exact same behavior and more that Macalester had used to justify condemning Olson and stripping him of his education.

203.    Macalester completed its alleged investigation of Jane Roe, whom the college had long since allowed to graduate, on October 16, 2020.

204.    Once again, Macalester insisted that Olson could not have a copy of the investigation report with respect to his complaint ("Olson Report").  He could only view it via a video portal for limited amounts of time, while surveilled by a Macalester administrator.  This was despite the fact that the Olson Report included over 1000 pages of evidence, interview transcripts, and text, for which Farganis' law firm had billed to the college.

205.    Olson wrote Macalester repeatedly demanding an electronic copy.  He pointed out that his disability made it impossible for him to prepare an adequate response under these circumstances.  Macalester ignored these requests.

206.    Macalester restricted access to the Olson Report and evidence from Olson despite Title IX regulations that entered into effect August 14, 2020 and that provide, "the recipient [i.e. Macalester] must send to each party and the party's advisor, if any, the evidence subject to inspection and review *in an electronic format or a hard copy*."  34 CFR § 106.45(b)(5)(vi).

207.    Olson wrote to Macalester pointing out that Courts have also found this regulation to apply to Title IX cases initiated by campus courts like Macalester's *prior to* the effective date of the regulations.

208.   Instead of following the fair process codified in 34 CFR § 106, Macalester demanded that Olson's advisor in the process sign a so-called "advisor acknowledgement" expressly waiving his client's rights under Title IX.  The "acknowledgement" would have also waived access of Olson's advisor to an electronic or hard copy of the Olson Report and evidence as provided under the then-in-effect Title IX regulations.

209.   The Macalester "acknowledgement" even purported to forbid sharing information "with other members of the advisee's [i.e. Olson's] legal representation team."

210.   The Macalester "acknowledgement" further purported to empower Farganis to immediately disqualify and dismiss Olson's advisor or discipline Olson if any of the alleged "confidentiality" requirements or other conditions of the Macalester "acknowledgement" were not followed to the letter (of if Macalester perceived them to be breached).

211.   On October 25, 2020, Olson's advisor signed the Macalester "acknowledgment" with the following reservation: "provided that I do not agree to be bound by any requirements stated in this document that exceed or seek to curtail 34 CFR 106 nor does my client waive any rights under Title IX, 42 USC 1681, et seq. and the existing protections of the current Title IX policy of Macalester, to which he is fully entitled, or under state or federal law."

212.   Upon receipt of this "acknowledgement," Macalester permitted Olson's advisor to participate in a limited three-hour review of the Olson Report on October 26, 2020.

213.    Because of his disabilities and due to the undue stress created by Macalester's high-handed limitation on Olson's Title IX rights, Olson was debilitated on the day that Macalester made the Olson Report available.  He was throwing up, could not keep food down, and could not sleep.

214.    After this viewing, Olson wrote to Title IX Coordinator Farganis, "my advisor and I completed our review of the 51-page single-spaced investigation report. We have not been able to look at the exhibits, some of which run to 843 pages. When can we schedule an additional time to view the file?"  He again asked for an electronic copy of the file, which Macalester again refused.

215.    On October 28, 2020, Farganis informed Olson that it required his advisor to submit to a new Macalester "acknowledgement," this time without a reservation of rights. Macalester insisted that Olson and his advisor waive his rights under Title IX, 34 CFR § 106, and other applicable state and federal law.

216.    Olson and his advisor refused, informing Macalester that this violated Title IX and its implementing regulations.

217.    On November 2, 2020, Farganis informed Olson, "The advisor agreement does include confidentiality requirements that go beyond the requirements of FERPA.  But as we have indicated before, the agreement does not restrict your rights under the law." Farganis knew this statement to be false when made.  Macalester then forbid Olson's advisor from further participating in the process.

218.    Olson submitted his response ("Response") to the Olson Report on November 2, 2020, including textual and visual evidence of Jane Roe's abusive actions, malicious motives, and unstable condition.

219.    On November 6, 2020, Macalester informed Olson that he was not allowed to submit probative evidence as part of his Response.  In addition, Olson's Response to the Olson Report was arbitrarily limited by Macalester to "3000 words."  Olson's Response, Macalester informed him, was 3182 words.  He was therefore required to cut 182 words or else Macalester threatened to exclude his Response as well as all of the evidence.  He was given until November 7, 2020 to submit a revised statement of the required length which excised the evidence.

220.    Olson again objected that he had not been given an adequate opportunity to meaningfully respond to the Olson Report, either through access to the Olson Report and the evidence itself, or in terms of an adequate opportunity to respond.  He also again told Macalester how the process was adversely affecting his mental health condition.

221.    Olson also pointed out that Macalester's policy expressly permitted him to "report or identify information previously given to the investigator that is not included in the investigation report."  All information contained within the evidence Olson submitted with his Response had been previously identified to the investigator but not included in the Olson Report, and it was therefore within Macalester's rules.

222.   On November 6, 2020, Olson again submitted his Response with the evidence of Jane Roe's pattern of abuse.  He included federal case law indicating that Macalester was violating Title IX.[5]  Macalester ignored the law and excluded Olson's evidence.

223.   This process again caused Olson extreme emotional distress, manifested by sleeplessness, vomiting, weight loss, and panic attacks.

224.   On or around November 2, 2020, Jane Roe also submitted a response, captioned "I don't even want to dignify this case with a response."  She labeled Olson "a domestic abuser" who was submitting his Response as "just retaliation."  She then proceeded to raise new allegations, never-before-heard-of claims in the year-long history of Macalester's investigation of every minute detail of her relationship with Olson.  Although Macalester excluded Olson's evidence of previously identified information; Macalester did not exclude Jane Roe's allegations of completely new, outlandish facts.

225.   These new claims included allegations of violent rape and water boarding, in which Jane Roe claimed to have been "held … intermittently under the bathtub tap and water was going up my nose" so that Olson could force her, through this waterboarding technique, to have sex with him in the shower.

226.   Another incident Jane Roe alleged for the first time was a violent rape in "the driveway behind his apartment" in which Olson allegedly said, "I can't tell if it would actually be bad for me to just hold you down and fuck you right now."

---

[5] *John Doe v. Rensselaer Polytechnic Institute*, No. 20-cv-01185 (N.D.N.Y. Oct. 16, 2020) (holding university had obligation to abide by Title IX regulations that went into effect on August 14, 2020 in case that predated the effective date of the regulations).

227.   Jane Roe suddenly raised another new allegation that Olson anally raped her, "[o]nce, after we had sex multiple times that day," although she added, "at the time I felt more than willing" – and so apparently consented.

228.   As to why these allegations had never been raised before, Jane Roe claimed: "I didn't include incidents like these in my initial report, in part because I didn't even see the full iniquity in them until months later."   She added, "I'm not ready to remember these things"; and "I'm still trying to learn it's not okay for men to do things to my body that I didn't want."

229.   Jane Roe asked Macalester to believe she was sufficiently cognizant and self-aware to report John Doe for things like stalking her by evicting her from his own apartment, but not for actual, violent rape, which she now alleged for the first time because she somehow and suddenly realized what she called their "full iniquity."

230.   Olson was permitted to submit a reply in rebuttal, but Macalester informed him on November 10, 2020 that any rebuttal must be limited to 1500 words.

231.   Macalester again excluded Olson's advisor from viewing Jane Roe's response, because he refused to waive his client's rights under Title IX, its implementing regulations, or other state and federal law.

232.   Olson requested that he and his advisor be provided an electronic copy of the Jane Roe response as a reasonable accommodation for his mental health condition on November 11, 2020.  Macalester refused and again expressly refused to abide by Title IX regulations.

233.   Olson was again breaking down and his mental state deteriorated.

234.    Olson was granted a limited window to view Jane Roe's response, with its never-before-heard-of allegations of rape, at 4:00 p.m. on November 15, 2020.

235.    Macalester again excluded Olson's advisor.

236.    On November 20, 2020, Farganis wrote to Olson that the college suspected him of copying materials provided during the review session of November 15, 2020. Macalester informed Olson that the college "believe[s] that you improperly viewed the written statement outside of the supervised review session."

237.    Olson responded that he had repeatedly asked for the investigation materials and again pointed out that Macalester was violating Title IX by refusing to provide an electronic copy and by excluding his advisor in the process.

238.    Then, on December 8, 2020, Macalester informed Olson that it was canceling his complaint against Jane Roe:

> The College has determined that it will not continue [your] complaint resolution process … As discussed below, this decision was made based on the fact that neither of you are currently students at the College and the College's recent conclusion that you violated the rules of the supervised review of investigation materials.

> Since the complaint resolution process began over 8 months ago, the status of the parties and their relationships to the College have changed.  In May 2020, you were expelled from the College and banned from campus and from College functions or events without prior approval after College adjudicators found sufficient evidence to determine it was more likely than not that you engaged in conduct constituting domestic violence, stalking, and sexual harassment in violation of the College's Sexual Misconduct Policy.  In addition, in August 2020, [Jane Roe] completed the coursework needed for her to graduate from the College.

## V.   CAUSES OF ACTION

### COUNT 1:   Title IX of the Education Amendments of 1972

239.   This paragraph incorporates by reference all preceding paragraphs as if set forth here in full.

240.   Title IX of the Education Amendments of 1972 provides, in relevant part:

241.   No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

242.   Macalester is an institution of higher education that receives federal funding.

243.   Macalester has promulgated its Title IX Policy, among others, to comply with Title IX and its implementing regulations, 34 CFR 106.1 et seq., and with the Clery Act and its implementing regulations, 34 CFR 668.1 et seq.

244.   Plaintiff Ian Olson, a male student, was subjected to investigation following allegations of stalking, harassment, and sexual misconduct made against him by fellow Macalester student Jane Roe, a female student.

245.   Jane Roe had engaged in all the same behavior that she alleged Olson supposedly committed against her, including without limitation that which Olson reported to Dean Bradley.

246.   Macalester investigated Olson less than two weeks after Jane Roe made the first allegations against him, but Macalester did not begin to investigate Jane Roe concerning Olson's allegations against her for five months.

247.    On May 8, 2020, Macalester expelled Olson, causing him to forfeit his entire tuition, and Macalester has excluded him entirely from the college for all future time. Macalester timed this expulsion exactly one week before Olson would have earned his degree after struggling for 10 years to complete his education in the face of his disability.

248.    On May 15, 2020, Macalester awarded a degree on Jane Roe, who was allowed to graduate with all the benefits that a Macalester degree confers.

249.    Macalester acted with deliberate indifference to Olson's credible allegations of harassment, stalking, and abuse by Jane Roe.

250.    Macalester selectively enforced its Title IX policy against Olson.

251.    On information and belief, Macalester's discriminatory investigation and punishment of Olson is part of a pattern of conduct and behavior in which Macalester punishes male students differently and disproportionately for the same actions committed by female students, for which lesser or no sanctions are imposed, including against Jane Roe.

252.    Macalester's administrators have expressed gender bias against male, "heteronormative" students.

253.    Because of Macalester's violations of Title IX, Olson suffered emotional harm, direct damages, and indirect damages in an amount to be determined at trial.  Because Macalester has deprived Olson of his degree, permanently branded him a sex offender in his transcript, and refused at all times to take action against Jane Roe for her retaliatory interference with Olson's friendship and support network, Olson has suffered reputational damage and will suffer lost income for all future time.

**COUNT 2:**     Violation of the Title III of the Americans with Disabilities Act
and Section 504 of the Rehabilitation Act

254.    This paragraph incorporates by reference all preceding paragraphs as if set forth here in full.

255.    Section 504 of the Rehabilitation Act, 29 USC § 794(a), provides: "No otherwise qualified individual with a disability in the United States shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

256.    Title III of the ADA, 42 USC § 12182(a) provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

257.    Olson is disabled and suffers from disabilities within the meaning of the ADA and Section 504, not limited to autism spectrum disorder and bipolar disorder, including the symptom of pressured speech.

258.    Olson is otherwise capable of completing his degree at Macalester and in fact had completed all academic credits that qualified him to graduate on May 16, 2020 but for his wrongful expulsion by Macalester.

259.    Macalester is an institution of higher education and a place of public accommodation that receives federal funding.

260.    Macalester had actual knowledge of Olson's disabilities and symptoms, including his autism spectrum disorder, bipolar disorder, and pressured speech.  Olson had registered with DS.

261.    Macalester knew or should have known of Jane Roe's discriminatory treatment on the basis of disability in which she targeted Olson.

262.    Throughout the investigatory process, Olson requested reasonable accommodations from Macalester, none of which would fundamentally alter the nature of Macalester's educational program, including but not limited to the extension of deadlines to provide written responses and permission to submit evidence that explained the symptoms and nature of his disabilities.

263.    Macalester discriminated against Olson on the basis of disability by, without limitation:

- Selectively investigating Olson for alleged abuse of Jane Roe while looking the other way at Jane Roe's targeted discrimination of Olson on the basis of disability.

- Enabling Jane Roe's continued harassment and abuse of Olson through her contacts and retaliation against friends of Olson and others in his support network.

- Doing nothing in the face of Olson's repeated complaints of Jane Roe's discriminatory behavior.

- Forcing Olson to review hundreds of pages of investigatory documents and evidence in the space of a few hours scheduled at the convenience of Macalester's administrators and limiting any response of Olson's to Macalester's mass of investigatory materials to no more than 2000 words.

- Arbitrarily expelling Olson and denying Olson the benefits of his Macalester degree.

- Denying Olson reasonable accommodations for his disability in the investigatory process and adjudication.

264.    Because of Macalester's violations of Title III of the ADA and Section 504 Of the Rehabilitation Act, Olson has suffered emotional harm, direct damages, and indirect damages in an amount to be determined at trial. Because Macalester has deprived Olson of his degree, permanently branded him a sex offender in his transcript, and refused at all times to take action against Jane Roe for her retaliatory interference with Olson's friendship and support network, Olson has suffered reputational damage and will suffer lost income for all future time.

## COUNT 3:      Breach of Contract

265.    This paragraph incorporates by reference all preceding paragraphs as if set forth here in full.

266.    Macalester entered into contracts with Olson upon his matriculation composed of the policies, handbooks, and manuals promulgated by the college, including its Title IX Policy among others.

267.    Macalester's Student Handbook provided procedural and due process rights for all students, including Olson, and promised Olson that Macalester would ensure that he was free from sex-based and disability-based discrimination.

268.    Macalester also promised Olson that he would be free of retaliation as a participant in Macalester's Title IX process.

269.    Macalester promised Olson a fair, prompt, and equitable process to adjudicate both his complaint against Jane Roe and Jane Roe's complaint against him.

270.    Macalester breached its contract with Olson by, without limitation:

- Failing to provide Olson with fair adjudication of Title IX claims against him.

- Selectively enforcing its Title IX Policy against Olson.

- Expelling Olson one week before graduation while allowing Jane Roe to graduate without consequences although she had perpetrated substantially the same behavior against Olson.

- Excluding exculpatory witnesses in Olson's favor.

- Excluding exculpatory evidence.

- Refusing to protect Olson from Jane Roe's retaliation and continuing harassment.

- Discriminating against Olson on the basis of his disability.

- Discriminated against Olson on the basis of sex.

271.    Because of Macalester's breach of contract, Olson has suffered emotional harm, direct damages, and indirect damages in an amount to be determined at trial.  Because Macalester has deprived Olson of his degree, permanently branded him a sex offender in his transcript, and refused at all times to take action against Jane Roe for her retaliatory interference with Olson's friendship and support network, Olson has suffered reputational damage and will suffer lost income for all future time.

**COUNT 4:**      **Breach of the Covenant of Good Faith and Fair Dealing**

272.    This paragraph incorporates by reference all preceding paragraphs as if set forth here in full.

273.    Macalester's contracts with Olson included an implied covenant of good faith and fair dealing.

274.    Macalester breached the implied covenant of good faith and fair dealing.

60

275.     Because of Macalester's breach of the implied covenant, Olson has suffered emotional harm, direct damages, and indirect damages in an amount to be determined at trial.  Because Macalester has deprived Olson of his degree, permanently branded him a sex offender in his transcript, and refused at all times to take action against Jane Roe for her retaliatory interference with Olson's friendship and support network, Olson has suffered reputational damage and will suffer lost income for all future time.

### COUNT 5:        Negligence

276.     This paragraph incorporates by reference all preceding paragraphs as if set forth here in full.

277.     Macalester owed Olson a duty to fairly administer the procedural requirements set forth in its Student Handbook and not to act arbitrarily and capriciously in its decisions affecting Olson's education and degree.  Macalester assumed a duty to, among other things, protect Olson from discrimination on the basis of disability or on the basis of sex.

278.     Macalester breached its duty by demonstrating actual bias against Olson, a male accused student, in favor of Jane Roe, a female complainant, in its investigation, adjudication, and punishment of Olson.

279.     Macalester knew or should have known that Jane Roe harassed, abused, and discriminated against Olson on the basis of his disability.  Among other things, Jane Roe willfully, intentionally, and maliciously provoked the very behaviors she then turned around and complained of to Macalester's Title IX Office.

280.     Macalester pledged to provide Olson with a prompt, fair, and equitable investigation into all allegations, whether against Olson or against Jane Roe.

281.    By making these and other promises, Macalester assumed a duty to fairly and equitably investigate claims of harassment and misconduct, without bias or discrimination.

282.    Macalester knew or should have known that Jane Roe's behavior, including her ongoing retaliation and harassment of Olson through his friendship and support networks, would damage Olson's mental and physical well-being.

283.    Macalester breached its duties to Olson by, among other things, selectively enforcing its Title IX policy to benefit Jane Roe but to punish and sanction only Olson.

284.    Because of Macalester's negligence, Olson has suffered emotional harm, direct damages, and indirect damages in an amount to be determined at trial.  Because Macalester has deprived Olson of his degree, permanently branded him a sex offender in his transcript, and refused at all times to take action against Jane Roe for her retaliatory interference with Olson's friendship and support network, Olson has suffered reputational damage and will suffer lost income for all future time.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff that the court grant judgment including the following relief:

    i.   Declare Defendant Macalester College in violation of Title IX of the Education Amendments of 1972, 20 USC § 1681, et seq.;

    ii.   Declare Defendant Macalester College in violation of the Title III of the Americans with Disabilities Act, 42 USC § 12181, et. seq., and Section 504 of the Rehabilitation Act, 29 USC § 794;

    iii.   Declare Defendant Macalester College in breach of contract and in breach of the implied covenant of good faith and fair dealing;

    iv.   Declare Defendant Macalester College negligent;

    v.   Order Defendant Macalester College to pay Plaintiff Ian Olson direct, indirect, and special damages in an amount to be determined at trial;

vi.   Order Defendant Macalester College to pay Plaintiff Ian Olson punitive damages;

vii.   Order Defendant Macalester College to expunge Plaintiff Ian Olson's record of any and all findings of sexual misconduct;

viii.   Order Defendant Macalester College to confer the undergraduate degree that Plaintiff Ian Olson has paid for with his tuition and earned;

ix.   Order Defendant Macalester College to pay Plaintiff Ian Olson' is reasonable attorney fees under 42 USC 1988(b); and

x.   Order such other equitable and legal relief as this Court deems just and proper.

## JURY DEMAND:

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Respectfully submitted,

Dated:  July 7, 2021

s/Benjamin Loetscher
Ferdinand F. Peters (#157041)
Benjamin Loetscher (#0389037)
FERDINAND F. PETERS, ESQ. LAW FIRM
842 Raymond Ave., Suite 200
St. Paul, MN  55114
Telephone:  (651) 647-6250
ferdpeters@ferdlaw.com
bloetscher@ferdlaw.com

*-and-*

Michael Thad Allen, Esq.
(*pro hac vice pending*)
(Connecticut Juris No. 435762)
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT  06375
Telephone:  (860) 772-4738
mallen@allenharrislaw.com

for PLAINTIFF

63