UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Ian Olson,                                    File No. 21-cv-1576 (ECT/DJF)

           Plaintiff,

v.                                            **OPINION AND ORDER**

Macalester College,

           Defendant.

---

Michael Thad Allen, Allen Harris PLLC, Quaker Hill, CT, and Ferdinand F. Peters and Benjamin Loetscher, Ferdinand Peters Law Firm, St. Paul, MN, attorneys for Plaintiff Ian Olson.

Sean R. Somermeyer and Timothy M. Sullivan, Somermeyer Sullivan PLLC, Minneapolis, MN, for Defendant Macalester College.

---

Defendant Macalester College expelled Plaintiff Ian Olson after Macalester officials found that he had engaged in domestic violence against, stalked, and harassed a female student who will be referred to as "Jane Roe." In this case, Olson claims that Macalester's actions and his expulsion violated federal and Minnesota law. He asserts federal claims for sex discrimination under Title IX and for disability discrimination under the Americans with Disabilities Act and the Rehabilitation Act, and he asserts negligence and contract claims under Minnesota common law.

Macalester has moved to exclude two of Olson's expert witnesses and for summary judgment. With one exception, Macalester's motion to exclude Olson's experts will be granted. The better answer is that the experts' proffered opinions fail various rules

governing their admissibility.  The exception is that, if the case were tried, Olson's psychologist expert would be allowed to testify regarding Olson's mental health, including its impact on his functioning and behavior.  Macalester's summary-judgment motion will be granted.  Olson's federal claims are not trial-worthy because Olson has not identified record evidence from which a jury might reasonably find that Macalester discriminated against him on the basis of sex or disability.  Olson's negligence claim is not triable because no reasonable jury could find that Macalester's expulsion decision was arbitrary and capricious.  Olson's contract claims fail because he did not defend them in response to Macalester's motion.

<div align="center">I</div>

The following description of the case's background facts deserves a brief introduction.  The facts are lengthy because the record is extensive.  Macalester submitted over 1,000 pages of exhibits in support of its motions.  *See* ECF Nos. 80–84, 89.  And Olson submitted over 1,000 pages of exhibits in opposition to Macalester's motion.  *See* ECF Nos. 98–99, 101.  The volume of these submissions is understandable.  Macalester reviewed and considered a significant quantity of information in the course of its investigations, and the record includes extensive electronic communications between Olson, Roe, Macalester, and others.  The extensive record deserves full consideration.  Notwithstanding their length, the following facts are undisputed or described in a light most favorable to Olson.  Fed. R. Civ. P. 56(a).  To be clear, text messages and emails are quoted extensively—not necessarily for the truth of their content—but more often because these

electronic communications show beyond dispute the identities of senders and recipients, what was communicated, and when these communications occurred.

### A

*Macalester, Olson, And Olson's Relationship With Roe*

Macalester is a private college located in St. Paul, Minnesota, and it receives federal funding. Compl. [ECF No. 1] ¶ 7. Olson was a student at Macalester from September 2010 until his expulsion on May 8, 2020. A0025; A0061.[1]

Olson was diagnosed with bipolar disorder in 2011.[2] A0026. Olson's bipolar disorder has manifested in stress-induced manic episodes, including "pressured speech." A0750. Individuals who experience "pressured speech" feel "an extreme need to share their thoughts, ideas or comments," often loudly, incomprehensibly, and without the ability to stop. Compl. ¶ 16. Olson's condition also impacted his focus, mental clarity, decision-making, and emotional stability. A0755. Olson was prescribed medications for his bipolar disorder and its symptoms. A0983; A0019. On several occasions he was admitted to hospitals and mental health centers for treatment following mental health episodes; he was

---

[1]     Macalester filed an appendix with its motion containing five volumes of exhibits. *See* ECF No. 80 (A0001–A0413); ECF No. 81 (A0414–A0537); ECF No. 82 (A0538–A0607); ECF No. 83 (A0608–A0722); and ECF No. 84 (A0723–A0999). These exhibits will be cited by reference to Macalester's pagination.

[2]     Olson has alleged that he also suffers from autism spectrum disorder. Compl. ¶¶ 1, 11; ECF No. 84 at A0918. Olson's expert witness, psychologist Frank Dattilio, Ph.D., has opined that "Olson does not meet the diagnosis for autism spectrum disorder." ECF No. 89-4 at 4. Regardless, whether Olson suffered from autism spectrum disorder is not a material issue for purposes of Macalester's motions.

arrested at least once during an episode.  A0019–A0020.  He was treated by a psychiatrist from March 2016 through at least May 2020.  A0983; A0755.  Over his nearly ten years at Macalester, Olson's mental health caused him to take six leaves of absence totaling nine semesters.  A0466; A0943–49 ¶¶ 7–30.

Olson and Jane Roe, also a Macalester student, met in the fall of 2018 and began dating in January 2019.  A0430; A0565.  Roe moved into Olson's apartment in the late summer of 2019 and lived there for about three months.  *Id.*  After Roe moved in, Olson and Roe's relationship deteriorated.  Text messages between Olson and Roe show that their relationship was strained.  A0586 (Olson to Roe: "I AM GOING TO FUCKNG STRANGLE YOU," "god if you were here I'd hit you"); A0554–58 (Olson to Roe: "YOU WHORE," "I will leave you worse than homeless," "I HAVE A MOOD DISORDER YOU CUNT"; Roe to Olson "Find yourself a place or come here and strangle me like you said," "You're not right rn I'm not supposed to believe anything you say"); ECF No. 98-3 at 5, 9 (Roe to Olson: "I need to be dead," "stupid fucking hypocrite," "your [sic] fucking incapable of not oversexualizing your girlfriends").  The text messages also show that Olson repeatedly asked Roe to leave his apartment but that she refused to do so until October 2019.  ECF No. 98-2 at 39–78 (Olson: "please find a healthy place to go, it is not here . . . idk how many times to ask," "right now I need you to go away and find another place," "you are strangling my ability to say or do anything in my own apartment, and in the meantime calling me cruel and mean," "YOU NEED TO GO FOR YOUR OWN WELL BEING," "STOP TELLING ME HOW INSANE I AM AND LEAVE"; Roe: "please come back to me you're not right rn please come back to me," "please I need the

real Ian to come back please," "So come here and rip me off the bed and throw me out in the hall," "None of what you're saying is real," "Get your medication and go like you said"). The couple ended their relationship in October 2019. A0430; A0565.

<div style="text-align:center">B</div>

<div style="text-align:center">*Macalester's Sexual Misconduct Policy*</div>

Macalester addresses sexual misconduct in its Sexual Misconduct Policy. A0368–A0403. The Sexual Misconduct Policy in place during this case's events had been revised in August 2016 and reviewed in September 2017. A0368. The Policy's purpose is to "outline[] Macalester College's community expectations to ensure a campus free from sexual violence, the steps for recourse for those individuals whose rights may have been violated, and the procedures for determining a violation of College policy." *Id.*

"This policy is distributed annually to all students and employees of the College" and can also be found at the Office of Student Affairs, the Ruth Stricker-Dayton Campus Center, or on Macalester's website. *Id.* It applies to all Macalester "community members," which includes "students, faculty, administrators, staff, volunteers, vendors, independent contractors, visitors, and any individuals regularly or temporarily employed, studying, living, visiting, conducting business or having any official capacity with the College or on College property." *Id.* Not only is the policy applicable to conduct occurring on campus, but it also applies to any College-sanctioned events or programs and any "off-campus conduct that the College determines may cause or threaten to cause an unacceptable disruption at the College or which may interfere with an individual's right to a non-discriminatory educational or work environment." *Id.*

<div style="text-align:center">5</div>

The Policy defines "sexual misconduct" as referring "to all forms of sex discrimination, including sexual and gender-based harassment, sexual assault, sexual exploitation, stalking, dating/intimate-partner violence, and domestic violence." *Id.* The Policy further defines each of these and gives examples of actions that would fall under these classifications. A0372–A0376.

The Policy provides several avenues for reporting sexual misconduct. An individual may submit a report by contacting the Title IX Coordinator, campus security, the Assistant Vice President of Student Affairs/Dean of Students & Deputy Title IX Coordinator, Associate Dean of Students & Deputy Title IX Coordinator, Head Softball Coach/Senior Woman Administrator & Deputy Title IX Coordinator, Director of Center for Study Away & Deputy Title IX Coordinator, or via an online reporting form. A0380. Also, "all College employees who are not confidential resources, who obtain or receive information regarding a possible violation of this policy must report that information to the title IX Coordinator." *Id.*

On receipt of these reports, the Title IX Coordinator "will evaluate the information received and determine what further actions should be taken consistent with the 'Procedures for Sexual Misconduct Complaint Resolution' section" of the Policy. A0381. After a report of a potential violation of the Policy has been received but before the completion of the response and resolution process, the Coordinator is to decide whether interim actions or protective measures are necessary. A0386. Appropriate measures are determined on a case-by-case basis. *Id.*

The "Procedures for Sexual Misconduct Complaint Resolution" section of the Policy details the process the College follows when there is a sexual misconduct report. A0388–A0395. The Policy explains that the first step in most cases is a preliminary meeting between the complainant and the Coordinator. A0388. The purpose of that meeting is to give the Coordinator "a basic understanding of the nature and circumstances of the report or complaint." *Id.* During the initial meeting, the Coordinator will gather information, address immediate safety concerns, notify the complainant of his or her rights, provide information on resources, explain the procedural options, including how to file a complaint and the complaint process. A0389.

The filing of a complaint begins the complaint resolution process. *Id.* Though in most cases the complaint is made by the complainant, "the College reserves the right to move forward with a complaint resolution process to protect the safety and welfare of the community, even if the victim chooses not to make or move forward with a complaint." *Id.*; A0383. The Coordinator usually makes this determination. A0389. Upon receiving a complaint, the Coordinator will meet with the respondent notifying him or her of the complaint and alleged policy violations, explain the process, provide information on resources, among other explanations of the Policy. A0390. Informal resolutions are sometimes available, but they are never permissible for cases involving sexual assault, dating/intimate partner violence, domestic violence, or stalking. *Id.*

When an informal resolution is unavailable or fails to resolve the situation, the formal resolution process begins. A0391. The procedure section includes general timelines for each stage but with the caveat that each case presents different levels of

complexity, as well as other outside factors, that may affect the timing of the entire process. *See* A0388–A0397. The first step is the investigation. A0391. The College will appoint investigators who have received training and who do not have conflicts of interest. *Id.* The investigator has discretion over who to interview and what evidence to consider, but generally the investigation will consist of interviews with the complainant, respondent, and witnesses and the collection of physical, documentary, or other appropriate evidence. *Id.* The parties may suggest witnesses and evidence they believe the investigator should interview and review, but the ultimate decision is within the complete discretion of the investigator. *Id.* During this time, the parties will be notified of the close of evidence date, after which no additional evidence will be considered, unless the investigator determines otherwise. A0392. The close of evidence is the conclusion of the investigation. *Id.* At that time, the investigator will compile an investigation file, which may include the complaint, any submitted evidence, audio or written recordings of interviews, and the investigator's report of the investigation. *Id.* The investigation file will then be sent to the Coordinator, who will review the file and may ask the investigator for clarification, additional investigation, or to remove/redact information from the report. *Id.*

The next step for complaints involving allegations of sexual assault, dating/intimate partner violence, domestic violence or stalking is to allow each party to review the file and submit a written response. *Id.* No copies or photos may be made or taken of the investigation file, and the responses are subject to a word limit. *Id.* Then, the parties will have an opportunity to view each other's written responses and file rebuttal statements if desired. *Id.* Those too are subject to viewing restrictions and a word limit. *Id.* Once the

rebuttal period ends, the Coordinator may make the same requests as those authorized at the end of the investigation.  A0393.

Then comes adjudication.  *Id.*  The College will appoint two adjudicators who have received appropriate training and are free of conflicts of interest.  *Id.*  When making their determination, the adjudicators are to use a "preponderance of evidence" standard to decide "whether it is more likely than not that the respondent violated the policy."  *Id.*  They review the entire investigation file and may request additional investigation.  *Id.*  Upon a finding of a violation, the adjudicators will impose sanctions or remedies.  A0394–A0395.  The outcome is sent to the complainant and respondent at the same time by letter or email.  A0395.  Included in the notice for complaints involving sexual assault, dating/intimate partner violence, domestic violence, or stalking will be the rationale for the sanctions and information describing the appeal process.  *Id.*

Either party may submit an appeal on one or more of the following bases: (1) a procedural error that substantially affected the outcome of the process; (2) the decision was arbitrary and capricious or violated academic freedom; (3) a discovery of significant new factual material not available to the investigator that could have affected the original outcome; or (4) the sanction or other response was excessively severe or grossly inadequate.  A0396.  The party seeking appeal must submit an appeal request to the Coordinator explaining the grounds for appeal, and the non-moving party may file a written response to the appeal.  *Id.*  The Coordinator will compile an appeal file consisting of the investigation file, the notice of outcome, the written appeal statement, the responsive appeal statement, and all prior written statements from parties.  *Id.*  For complaints

involving sexual assault, dating/intimate partner violence, domestic violence, or stalking, the parties will be allowed to review the appeal file.  A0396–A0397.

If there is an appeal, then the Coordinator appoints an appeal officer who will determine if "it is more likely than not that the above-listed grounds for appeal have been satisfied and impacted the outcome of the process."  A0397.  If the appeal officer finds in the affirmative, the matter is remanded for further investigation or deliberation, and new adjudicators may be appointed.  *Id.*  If the appeal officer finds in the negative, the appeal will be dismissed—a decision that is final.  *Id.*  The appeal officer will issue a written decision including the final disposition of the appeal.  *Id.*

 Apart from the formal resolution process, the Policy also prohibits any form of retaliation.  A0398–A0399.  The Coordinator "may exercise discretion to determine an appropriate responsive process based on the facts and circumstances" when the College receives a retaliation complaint.  A0399.  This is a "separate and distinct" process from the "Procedures for Sexual Misconduct Complaint Resolution" explained above.  *Id.*

<center>C</center>

<center>*Roe's Complaint Against Olson*</center>

In fall 2019, Roe told an instructor that she was locked out of her apartment and that this interfered with her ability to attend class.  A0338.  Because the instructor believed the situation involved a domestic dispute, Macalester's Associate Dean of Students, Andrew Wells, was informed and initiated a meeting with Roe.  *Id.*  During and after the meeting, Wells advised Roe of her options, which included a no-contact directive, a civil order for protection, and a Title IX sexual misconduct complaint under the Policy.  A0415.

<center>10</center>

On Roe's request, Macalester issued a no-contact directive to Olson and Roe on November 6, 2019.  A0418–A0419.  Olson responded to the notification via email, writing: "Thank you Andrew.  I think this is necessary and it is appreciated."  A0418.  The next day, November 7, 2019, Roe sought a civil order for protection in Ramsey County District Court.  A0421–A0441.  The order prohibited Olson from being physically present on the Macalester campus.  A0047.  Macalester allowed Olson to continue his coursework off-campus, and at a subsequent Ramsey County District Court hearing, Roe agreed that Olson should be allowed to be on campus to attend classes he needed to complete for graduation. A0457–A0460; A0479.

On November 8, 2019, Roe initiated a complaint with Macalester's Title IX office. ECF No. 98-1 at 43–45; A0561.  Olson was notified of Roe's complaint on November 15, 2019, and he spoke by telephone with Dion Farganis, Macalester's Interim Title IX Coordinator, that same afternoon.  A0443–A0444.  The call's purpose was to enable Farganis to "explain to [Olson] [his] rights, the steps of the College's complaint resolution process, and try to answer any questions [Olson] might have."  *Id.*  Olson was "very distraught" during the call and stated he was "under the influence of a number of substances."  A0047.  Olson also told Farganis that he and Roe had a "mutually difficult relationship" that "seemed to be escalating after the breakup."  *Id.*

Roe's complaint triggered a formal Title IX investigation that resulted in a final report completed on March 4, 2020.  A0560–A0607.  Throughout the complaint review process, Olson was allowed two advisors, though the Policy ordinarily permitted one advisor.  A0047; A0385; A0150; A0610.  Sarah Duniway was the third-party investigator

11

tasked with assembling the relevant facts for the College to consider when making its decision.  A0560–A0561.  Initially, Olson notified Macalester that he had a conflict of interest with Duniway, but he never followed-up or explained the conflict.  A0449–A0451; *see* A0387.

The investigation consisted of interviews with eleven witnesses—including Olson and Roe—and the report included 241 pages of exhibits.  A0560–A0607.  Duniway first interviewed Roe on November 22, 2019, and first interviewed Olson on December 6, 2019.  A0563.  Olson's interview took place at his attorneys' office in the presence of his counsel.  A0049.  Both Roe and Olson had the opportunity to provide evidence and identify witnesses.  A0193.  Twenty-one potential witnesses were identified, with Roe suggesting fourteen and Olson suggesting seven.  A0494–A0495; A0564.  Six of Roe's suggested witnesses, and three of Olson's, were interviewed.  A0563–A0564.  After Duniway interviewed these witnesses, she again interviewed Roe and Olson to fill in gaps, ask follow-up questions, and give them an opportunity to respond to specific allegations.  A0193; A0563.  These second interviews occurred on January 20, 2020, for Roe, and on February 6, 2020, for Olson.  A0563.  During this investigative process, Duniway reviewed around 250 pages of Macalester documents and evidence submitted by both Roe and Olson.  A0561–A0562.  These materials included the Macalester Sexual Misconduct Policy, Student Handbook, Roe's complaint, text messages, emails, photographs, court filings, and a homework assignment.  *Id.*

Once the investigative phase was complete, Duniway prepared a 47-page report summarizing her findings, dated March 4, 2020.  A0560–A0607.  Both Olson and Roe had

an opportunity to review the investigation report and provide written responses. A0616–A0617. Olson scheduled a Zoom review session with his attorneys for March 11, 2020. A0612–A0616. Additional review sessions were canceled and rescheduled multiple times at Olson's or his attorneys' request. A0622–A0625. Additionally, Farganis, extended the review session window altogether and provided weekend viewing opportunities. A0622–A0623. Olson reviewed the investigation report with his attorneys and submitted a written response. A0065; A0636–A0639.

After receiving Olson's response, Farganis notified Olson that certain sentences, or parts thereof, in his "response exceed[ed] the scope of information that may be considered in the complaint resolution process . . . because they refer to concerns raised by individuals who are not parties to the matter." A0636. Farganis asked Olson either to re-submit his response after removing the specified portions or give Farganis permission to redact them from the original. *Id.* Olson responded with an email threatening to make the matter, or perhaps parts of it, public. A0635 ("This is your last fucking chance to get your shit together before all of your actions in this case go public . . . [I]t looks like Dion here wants to create an outcome wherein . . . he and the college are sued all the way to hell and back."). Olson sent another email the following morning demanding that his original response be filed. *Id.* ("If you do not send the letter AS WRITTEN some of the women in my life will be contacting your office and doing what they can to make your actions known. Reply ASAP."). Farganis replied explaining that the decision to remove allegations by other individuals from Olson's response is a routine part of the process, and the same standards applied to Olson are applied to every statement Macalester reviews. A0634. The deadline

for Olson to provide an updated or redacted statement passed, so Farganis redacted the sentences from Olson's original written response and considered it submitted. A0633. Roe also submitted a written response to the investigation report. A0629–A0631.

After the written responses were submitted, the rebuttal stage of the process began. A0649. This stage provided Roe and Olson each an opportunity to review the other's statements and to submit a rebuttal statement of no more than 1,500 words. A0649; A0665. Farganis extended the review period an extra day after Olson indicated he was not in a stable mindset, and a Zoom meeting to review Roe's written response was scheduled for April 2, 2020. A0660–A0663. Both Olson and Roe then submitted rebuttal responses. A0668–A0670; A0672–A0674.

The adjudication phase was next. Two Macalester officials were chosen as the adjudicators for Roe's complaint: Eily Marlow, Program Associate for Vocation and Reflection, and Robert Graf, Director of Employment Services. A0620. The selected adjudicators were to "determine whether it [wa]s more likely than not that [Olson] engaged in a policy violation and, if they [found] [Olson] responsible for a policy violation, they [would] impose sanctions." A0661. This information was sent to Olson and his two attorneys on March 12, 2020. A0620. The parties had two days to notify Farganis if they had concerns about the chosen adjudicators, but neither party raised concerns. *Id.*; A0393; A0387. The two adjudicators received training on the Policy and how to fairly adjudicate sexual misconduct complaints. A0926 ¶¶ 3–4; A0938–A0939 ¶¶ 3–4. In adjudicating the complaint, Marlow and Graf reviewed the Policy, the investigation file, and the parties' written responses and rebuttal statements. A0927 ¶ 8; A0939 ¶ 8.

14

The adjudicators provided their Notice of Outcome on May 8, 2020, which explained their findings and rationale.  A0687–A0722.  They found that "it [was] more likely than not that Ian engaged in domestic violence, stalking, and sexual harassment as defined by the Policy" and "engaged in hostile environment harassment of [Roe] on the basis of her actual or perceived religion."  A0714.  The Notice imposed three sanctions against Olson: expulsion, an amended no-contact directive, and a no trespass notice. A0715–A0716.  Olson's expulsion from Macalester was effective immediately on May 8, 2020, eight days before he was to have graduated.  A0715.  The no-contact directive put the burden on Olson to remove himself from any situation where he and Roe happened to be in the same space and required him to remain at least 25 feet away from Roe.  *Id.*  The no-trespass notice prohibited Olson from visiting Macalester's campus and attending any Macalester functions or events without prior approval from the Title IX Coordinator. A0716.

The Notice of Outcome also contained information about the appeal process.  *Id.*  It explained that any "appeals must be submitted in writing to the Title IX Coordinator within ten (10) days from the date of [the] letter" and "may not exceed 2,000 words."  *Id.*  Olson sought a two-week extension of the appeal deadline "due to the serious and nearly-grave nature of [his] medical illnesses," "COVID-related delays," "several advocacy groups and two federal agencies . . . actively involved in supporting [Olson]," and alleged, though unspecified, extensions Macalester gave to itself.  A0732–A0734.  Macalester extended the appeal deadline two days.  A0731.  Olson responded that the extension was "unconscionable" and that the new deadline "does not allow [his] lawyer's office proper

time to prepare for an appeal . . . due to delays from COVID." *Id.* Several minutes after Olson's first response, he sent another email complaining that Farganis should "not [be] allowed to give [himself] extra time and then to deny it to [Olson]." A0730. Olson also wrote: "Stop fucking with me, Dion." *Id.* Farganis replied, explaining that "the policy makes clear that the College does not unnecessarily delay its processes to accommodate the schedules of advisors." *Id.* That same day, Olson submitted a letter from his psychiatrist supporting the requested appeal deadline extension. A0737. After receiving the letter, Macalester emailed Olson and his psychiatrist asking for "specific and concrete terms" that explain Olson's barriers to meet the already extended deadline and how the additional requested time would eliminate those barriers. A0746. Olson responded with a string of emails over the next two hours:

- "Every hour that passes you are deliberately sidestepping the law." A0745.

- "The sheer bias you display in forcing me to type emails like this, while significantly medicated and in distress, is inhumane." *Id.*

- "You are forcing a very disabled adult to worsen his illness simply because, somewhere in your 100 billion neurons, you lack the ability to follow the law. It is fucking pathetic and it will only escalate the consequences for you." *Id.*

- "You don't need another note from my doctor, you need a fucking sliver of compassion." A0746.

- "You have all the power in the world to be compassionate and to follow the law and you are continually choosing not to. It's as if you are utterly excited to have the Office of Civil rights up your ass for the next year." A0744.

16

- "I already went above and beyond and provided private medical information to you re: suicidality 2 weeks ago. That you would disregard that information is heartless and is part of why kids at Macalester kill themselves from time to time. You are fucking around. It is really, really, really pushing me." A0745.

- "In my imagination I can see you typing one of your characteristically avoidant and buffoonish replies." A0744.

- "Are you *trying* to make me hurt myself, or is that just something you're doing out of sheer stupidity? Macalester does not need another dead student on its hands and you are pushing an individual with mental illness to his breaking point." A0743 (emphasis in original).

- "You continue to act like your brain is full of helium instead of working neurons. It is shocking that you and your stupid-ass brain continue to force me to write these messages. Stop pressuring me and stop interfering with my health. Every passing minute I am falling apart and it is **your** fault. You serve me and the student body and you're asking me to lick your rotten toes." *Id.* (emphasis in original).

- "You can and will extend this deadline to 6/1. Or else, as I've said, things will keep escalating. I can assure you that you don't want that." A0744.

- "I would not be unraveling mentally and emotionally if you would just stop posturing and do your fucking job, Dion. Extend the deadline. Stop pushing me. You have until 3pm." *Id.*

- "Why on earth would you impose this capricious deadline on such an ill student? what the fuck is wrong with you people? Hurry up and offer reasonable accommodation before this continues to escalate." A0742.

Olson copied his psychiatrist on these emails.  A0742.  Macalester's Title IX and

Bias Harassment Coordinator, Regina D. Curran, responded to Olson's email string by

providing several resources for mental health crises, encouraging Olson to seek support, and offering to help him connect with the various resources she had identified.  A0742–A0743.  Curran also explained that the College was still waiting to receive more detailed information from Olson or his psychiatrist regarding the need for an additional extension.  A0740–A0741.  Olson responded with the following:

- "The distress I am experiencing is directly related to the bullshit posturing and arbitrary demands you are placing upon me and my doctor. . . . Stop feigning concern for my health; start doing your job. You absolute clowns."  A0740.

- "Your office is so full of shit that you have angered my entire wellness network. That you have already received communications from me, my psychiatrist, and my emergency contacts and are still trying to insert yourself into a 'plan' makes me wonder if your brain is filled with whipped cream rather than neurons."  A0739.

- "Reasonable accommodations have been requested for a week now and you turds continue to provoke me and litigate the circumstances of my accommodations. My psychiatrist will be reaching out to you shortly, in the meantime pull your rotten head out of your asshole and stop provoking my speech, mood, and illness overall."  A0739–A0740.

Olson's psychiatrist provided additional and more specific reasons why an additional extension was necessary.  A0755–A0756.  Macalester then extended Olson's appeal deadline one more week.  A0752.  In total, Macalester provided nine extra days for Olson to file an appeal.  *Id.*  Olson continued to communicate his complaints regarding the appeal process in emails:

- "This appeal process follows the needs of my illness and not the other way around. Your bullshittery has been noted and your current lack of compliance is being fwd'd to a large # of alums."  A0751.

18

- "Damn your wretched soul for your weak-ass citations of meager parts of my voicemail."  A0750.

- "So fuck your fat ass to hell for continuing to antagonize me. You won't last a semester at Macalester with this degree of ineptitude and oafishness. . . . You are absolutely fucked." A0750–A0751.

- "Fuck you for making the initiation of this process so difficult already. No wonder your career looks like a pile of rotting dog crap on the side of the road than anything a capable human being would formulate. Good luck on your next job after Mac." A0751.

- "If I am hospitalized in the next week it will be your fault. What a bowl of grease you are. Now I cannot calm down because another bitch-ass white woman is pretending like she knows my illness better than I do. Grab a snickers, sit down, and consider whether you want to offer reasonable extension or whether you want to keep being a bitch."  *Id.*

- "I have a deadly illness that your cottage-cheese looking ass is provoking."  A0750.

- "You will be hearing from many more alums tomorrow. Wipe the butter out of your ears and listen up: fair and equitable accommodations for my flexibility follow the needs of my illness and not the other way around."  *Id.*

Olson submitted his appeal on May 27, 2020.  A0724–A0728.  Roe filed a written response.  A0758–A0760.  The parties then were given the opportunity to review the appeal file.  A0783.  Macalester Director of Accounting, Dave Berglund, was selected as the appeal officer.  A0778.  Olson was allowed an opportunity, as he was with the investigator or adjudicators, to raise concerns with the selection or if he believed there was a conflict of interest.  *Id.*  Olson requested Berglund's CV, but Macalester refused to provide it on

the ground that it was not part of Macalester's process.  A0776.  Olson also requested that "Macalester appoint an outside and independent appeal officer to handle [his] appeal" because he thought an in-house appeal officer created a conflict, though Olson provided no specific concerns regarding Berglund.  *Id.*  Macalester declined Olson's request, explaining there were no conflicts between Berglund and the adjudicators, and that in its view the College's use of in-house adjudicators and appeal officers was consistent with federal law.  A0775.  Berglund received training on the Policy and on unbiased decision-making.  A0911–A0912 ¶¶ 3–4.  He had never met Roe or Olson.  A0912 ¶ 6.

Olson attempted to submit additional evidence that included photos of Roe's wrists and a photo of a lock Roe allegedly destroyed.  A0780–A0783.  He claimed he submitted these documents by adding Curran's email to a "shared" list within Google Photos, but Curran stated she never received any type of email.  *Id.*  Olson sent another email, but this time included the link to the photos.  A0781.  Though Macalester received the photos the second time, it requested confirmation that the materials were sent before the evidence deadline.  *Id.*  Olson took the position that Macalester was "arbitrarily trying to exclude relevant evidence from the appeal file, just as [it] did during the original investigation."  *Id.*  Olson provided no proof that the materials were sent within the deadline, but Macalester nonetheless included the photos in the appeal file.  A0780.

Berglund reviewed the parties' statements, the underlying investigation, and additional evidence submitted by Olson.  A0912 ¶ 9.  He "also requested and reviewed additional information relating to Olson's assertions regarding his opportunity to review the investigation report and attachments."  *Id.*  On July 9, 2020, Berglund's appeal decision

was issued. A0801–A0813. Berglund upheld the decision of the adjudicators and dismissed the appeal. A0802. He concluded that Olson failed to establish grounds for his appeal and affirmed the sanctions previously imposed. A0802–A0813. The appeal decision was final and not appealable. A0813.

## D

### *Olson's Complaint Against Roe*

Olson first raised concerns about Roe to Macalester in November 2019 after being notified of Roe's complaint. A0048–A0049; A0456. In a November 19, 2019, email to Wells, Olson wrote that "Dion will be helping [him] write a Title IX complaint against [Roe] which is long overdue based on her behaviors during the relationship. The problematic dynamic was mutual." A0456. On November 21, 2019, Olson sent several emails to Macalester administration. He emailed Farganis and explicitly stated that he wanted to file his own Title IX complaint. A0483. He emailed Farganis and Wells to inform them that Roe had been contacting Olson's "extended network" and warning them that "Ian is a domestic abuser." A0468–A0470. Olson explained that Roe's communication "was a violation of ALL current orders standing between [Olson] & [Roe]" and it was "*EXTREMELY* creepy behavior and [was] only meant to cause harm." A0470. He asked them to "please make note of this and take appropriate action." *Id.* The next day, Olson followed-up and again indicated his desire for Macalester to investigate Roe. A0469. After noting that he and Farganis were supposed to talk that day, however, Olson communicated that he was now unavailable because he was on the phone with his parents. *Id.*

Farganis responded, explaining that "[u]nder College policy, the College will take appropriate action against any individual who is found to have retaliated against another person, violated a No Contact Directive, or engaged in other conduct in violation of the College's policies, including the College's harassment policy. First, however, the College must engage in a process to determine if such a violation has occurred." A0468. Farganis further informed Olson that he had reached out the previous day to schedule a time to speak with Olson about his complaint, and that once he had more information about Olson's complaint, he "will be able to determine an appropriate responsive process that the College will follow as [it] look[s] into [Olson's] complaint." *Id.* Olson did not respond.

On December 2, 2019, Farganis followed up, asking when Olson had time to meet so that Farganis "[could] gather information about [Olson's] complaint and determine possible next steps." *Id.* On December 13, Farganis reached out "to check in again regarding [Olson] filing a complaint against [Roe]." A0483. Farganis explained that "if it is something [Olson] [is] still intending to pursue, [they] should probably connect about that sooner than later." *Id.* That same week, Olson asked if Farganis had any availability to talk within 48 hours. A0487. Farganis responded and apprised Olson of his availability, but Olson did not respond. A0486. Still without a response, Farganis emailed Olson again five days later, on December 26, 2019, to see if the two could discuss the circumstances around Olson's complaint. *Id.*

On December 27, 2019, Olson emailed Farganis and communicated that he wanted to file a Title IX complaint against Roe but was afraid to do so because of Roe's potential retaliatory actions. A0508. Olson wrote, "the thing I'm afraid of is more retaliatory action

from [Roe]. How do I know she won't do something else if I take the steps to file a complaint against her? . . . Put yourself in my position. Do you really think it's safe for me to file a Title IX? . . . I just want to preserve my right to go to school and feel that if I file a Title IX complaint against [Roe] something bad will happen to me, and I don't want that." *Id.* In that same email, Olson also discussed Roe's alleged harassment of her ex-boyfriend and ex-boyfriend's brother, the missing lock on his door that Roe removed, and property he alleged Roe took from him, including a camera. *Id.* Olson sent another email the next day further explaining his fear of Roe. A0507–A0508. His concerns included that additional Macalester women had blocked him on Facebook and that Roe "is known to carry several large knives on her person at all times." *Id.* The email also communicated his dissatisfaction with Macalester: "You said [you] would 'take appropriate action' way back in November when I first alerted you guys to [Roe's] ongoing harassment but it doesn't seem like you took any action at that time. Seeing as I haven't even filed an official Title IX investigation yet I am not quite sure whether you guys are serious about being helpful. . . . You have asked me over & over if I would like to talk & yet when I tell you what is going wrong I don't hear what consequences there will be for Roe." *Id.*

Farganis responded the next day, December 29, 2019. A0506–A0507. He reemphasized the instructions from his November 22, 2019, email and again explained that the first step in the College's process is for the student to meet with Farganis to discuss the situation and circumstances prompting Olson's anticipated complaint. *Id.* Farganis listed the four previous dates he requested to speak with Olson (November 21, December 13, December 21, and December 26) and asked if Olson would speak with him that week. *Id.*

He asked for copies of the threatening and harassing messages Olson had previously referenced, and he pointed Olson to College resources regarding safety concerns.  *Id.* Farganis also wrote: "Please note that although additional resources and interim measures from the College may be available, the scope of the response by the College may be impacted or limited if you decide not to move forward with a complaint."  A0507.  Olson did not respond.  A0506.

Farganis sent a follow-up email on January 2, 2020, asking if he and Olson could schedule a time to talk.  *Id.*  Olson responded that same day in a lengthy email, communicating his desire for an in-person meeting at his attorney's office and his disappointment with Farganis's lack of action.  A0504–A0506.  He also explained that at a "court date on 12/6 [Roe] and her lawyer threatened legal action against [Olson] if [he] filed a Title IX complaint against her."  A0504.  He said that he is "not delaying [his] Title IX complaint out of a lack of need but rather because [he] [is] pretty f&#k*ng terrified about what this person is going to do to [him] next."  *Id.*

Farganis responded just over an hour later, explaining that he could meet with Olson at his attorney's office anytime that afternoon or the next day.  *Id.*  Olson's attorneys, who had been copied on the email chain, replied that they reserved a conference room at their office and said to let them know when "you" can come over.  *Id.*  Farganis responded to the email, including both Olson and his attorney, not knowing if Olson's attorney's email was directed at Olson or Farganis and asking if Olson intended to meet that afternoon or the following day.  A0503.  Olson did not respond.  *Id.*  The next morning, on January 3, Farganis sent a follow-up email asking whether they settled on a time to meet.  *Id.*  Farganis

said that "[he]'d like to do this today if possible," but asked that they decide and communicate a time as soon as possible because his schedule for the day was starting to fill up. *Id.*

About two hours later, Olson responded that he "didn't hear back on the lengthy email that [he] wrote to [Farganis] which is concerning" and "because of the communication challenges that [Olson is] facing it would help to have those addressed before [they] meet." A0502. He continued:

> Patrick/Ferd, thanks for offering to meet today but because of some unexpected demands from my boss today, and the opportunity to schedule an appointment with a new therapist in about a half hour it looks like meeting today isn't ideal. I will be in touch over the weekend but am still scared about the potential outcomes of filing a Title IX against [Roe] and whether or not this will cause her to interfere with my education or well-being.

*Id.* Farganis responded on January 4:

> I received your email on Thursday and reached out with my availability for a meeting in response. A meeting with the person raising concerns to gather additional information is generally the first step of the process when we receive concerns related to potential violations of the policy. After we meet, I will be in a better position to determine the appropriate responsive process from the College.
>
> Again, the College is taking your report seriously and I would like to meet (or speak by phone, if that is easier for you) to discuss your concerns, the College's process, and available resources. Regarding your concern about filing a complaint, I do want to reiterate that you are not obligated to move forward with a formal complaint after we meet if you do not want to do so.

Please let me know when you would like to meet or speak by phone. Your advisor is welcome to be present for either of those conversations.

*Id.* Olson responded on January 5:

> **[Roe] threatened retaliation if I meet/speak with you to file a report.** Since filing her own NCD [Roe] harassed me in my personal life and I asked you to deal with it, and to explain to me *how* you were dealing with it. **Filing a report with you will lead to more threatening/harassing actions from [Roe]. I have made this clear and asked you to address it. This has been going on since November and aside from throwing out clauses from the student handbook you are not helping, and you are not hearing me.**

A0501 (emphasis in original). Farganis responded that same day:

> I assure you that I am hearing you. I understand that you are frustrated that the College has not taken action against [Roe] based on your report. But as I have stated previously, before the College takes action based on a report, we must engage in a process to determine if a violation of College policy has occurred. Just as the College is going through a process to investigate [Roe's] allegation that you have violated College policy, we need to have a process to investigate your allegation that [Roe] has violated College policy.
>
> As I have mentioned before, it would be very helpful to speak with you to gather more facts and details related to your concerns and to get your input on the College's next steps. I want to assure you that if [Roe] or anyone else is found to have engaged in retaliation or another violation of College policy after you speak with me, the College will take appropriate action in response. I encourage you to speak with me to provide additional information and so that we can discuss your rights and options under College policy. If you are not willing to meet with me to provide additional information, the College will take reasonable steps to respond to your report; however, the scope of the response by the College may be limited without additional information related to your concerns.

> Please let me know if you are willing to speak with me and we
> can set up a time.  As I have said before, your advisor is
> welcome to attend any call or meeting.

*Id.*  In a separate email chain to Wells the next day, Olson communicated that "[a]ll [he]

want[s] is to graduate," and though he desired to pursue a Title IX complaint against [Roe],

he feared retaliation and did not want to "f--- up her education as well."  A0542.  Olson

also wrote: "Dion has continued to push/support me to file a Title IX against [Roe]."  *Id.*

Additional email correspondence occurred in mid-February.  A0512–A0518.  What

began as a reminder for Olson of the evidence deadline in Roe's Title IX complaint process

soon shifted into an exchange regarding Olson's concerns.  *Id.*  Olson asked to meet with

Farganis "in-person as soon as humanly possible" to discuss Roe's alleged harassment and

violations of the no-contact-order.  A0517.  He also alleged that Roe "has continued to

make threats against people in [his] life" and "[i]t has been over three months since [he]

first reported [Roe's] threatening behaviors to [Macalester]."  *Id.*  Farganis replied the next

day, February 14:

> You stated in your email that another individual has harassed
> you and threatened your education.  It is important that we
> gather more information about this as soon as possible.  I will
> work with Andrew on arranging a time to meet or for a phone
> call so that you can provide us with more details about this
> incident or incidents, we can discuss your rights and options
> under College policy, and so that we can help direct you toward
> available resources.
>
> You raised concerns about threats made by [Roe] as well as
> [Roe] violating the no contact directive.  You indicated that
> you previously reported this conduct to the College.  As you
> know from our past communications, we made a number of
> efforts to gather additional information about these allegations
> so that we could determine an appropriate responsive process,

including in emails dated Nov. 21, Dec. 13, Dec. 21, Dec. 26, Dec. 29, Jan. 2, Jan. 3, Jan. 4, and Jan. 5.  You declined to speak with the College to provide additional information and to discuss your rights and options under College policy. Therefore, based on the information that I had from your emails dated Nov. 21, Nov. 22, Dec. 27, Dec. 28, and Jan. 2, I met with [Roe] in an effort to look into your allegations.  As I indicated to you in my email on Jan. 5, the scope of the response by the College may be limited without additional information related to your concerns.   Based on the information you provided and on my meeting with [Roe] the College currently does not have sufficient evidence to determine that a policy violation was committed by [Roe]. However, I encourage you to speak with me to provide me with additional information about your concerns so that the College can engage in a further process to respond to your report. Again, I will work with Andrew on scheduling a time to meet. As I have said before, if [Roe] or anyone else is found to have engaged in retaliation or another violation of College policy, the College will take appropriate action in response.

A0516.  Olson responded that same day:

So you are saying that a policy violation was NOT committed by [Roe] when she harassed former employers, friends, and ex-girlfriends living everywhere from the local area to as far away as China? . . . Everything I can see about Macalester's policy violations tells me that [Roe] did in fact violate the policy. Furthermore, she regularly threatened to harm herself and/or me if I did ever file a complaint against her, and with her lawyer's help similarly threatened me at court. . . . These are the reasons I am afraid to meet with you and why I have continued to hesitate. . . . I think if I were a woman or if my disabilities were being acknowledged Macalester would be treating me differently. The information I already gave indicates that [Roe] did violate policy whereas the complaints she has made about me are hearsay. I want to get together to meet but can you see why I am concerned both for my safety and for the effectiveness of your office?

A0515.  Farganis replied on February 17:

I again want to assure you that we are taking your allegations seriously, as we do with every report we receive about potential violations of College policy. I understand that you have already provided the College some information about your allegations that [Roe] has violated College policy. But the reason I have asked to meet with you multiple times before is that although you have made allegations, you have not provided sufficient facts surrounding those allegations to establish that a policy violation occurred.

As I have mentioned in our previous communications, after receiving an allegation of a violation of College policy, the first step is generally to meet with the party making the allegation to gather additional information about that allegation. In other words, just as the College is going through a process to gather additional facts related to [Roe's] allegation that you have violated College policy, we need to engage in a process to gather additional facts related to your allegations that [Roe] has violated College policy. You have not met with me or spoken with me to provide those additional facts. Therefore, in the interest of trying to move the process forward, I met with [Roe] to discuss your allegations as you had presented them in your various emails. Based on [Roe's] responses and the information you have provided, the College currently does not have sufficient evidence to determine it is more likely than not that [Roe] violated College policy -- the standard for finding any policy violation.

I want to clarify that the College is not finding that [Roe] did not violate College policy. Rather the College has concluded that, without additional information, we do not have sufficient evidence to determine that it is more likely than not that [Roe] violated College policy. I also want to note that with regard to your allegation that [Roe] violated the no contact directive, [Roe] contacting other individuals is not a violation of the no contact directive unless [Roe] has asked those individuals to contact you on her behalf.

Again, I encourage you to meet with me to provide additional information about your allegations and so that we can discuss your rights and options under College policy. We can also discuss resources that are available to you. A list of resources is included in the Sexual Misconduct Policy. As a reminder,

you are not obligated to move forward with a formal complaint after we meet if you do not want to do so. Please let me know if you are willing to speak with Andrew and me and we can set up a time. Your advisor is welcome to attend any call or meeting.

A0513–A0514.  Olson responded in two emails on February 17:

So what I am hearing is that you met with [Roe], found her complaints against me to be credible and proceeded with an investigation. But when I brought my allegations to [Roe] to your inbox directly, WITH evidence, you never found them to not be a violation, and declined to proceed? The next thing I am hearing is that even though I presented you with documented violations of college policy you decided to bring them straight to [Roe]. In the meantime this has emboldened her harassment. Dion, I have serious doubts in your abilities to proceed or do any of this whatsoever. I already provided you several documented instances of [Roe] seriously violating policy; and her actions at the gym with BL were violent and unsafe. Your continued preferential treatment of [Roe] is noted. I am happy to meet with you this week but as you have already shared my private complaints with [Roe] and allowed her to respond/be further EMPOWERED in her harassment, I will be looking into further legal action against you. It is tremendously disappointing that when I presented documented evidence of abuse against me, you simply said "We need to meet to discuss this" and on the side gave all of my complaints to [Roe] directly. You are not supporting me and you are helping [Roe] who is making completely false claims of abuse, threaten my education and my personal safety. This looks like it's going to get really ugly. . . . We should probably meet with Andrew and/or DeMethra. I do not trust you to take these complaints on your own.

***

I will add that it has been hard to "meet with you" when [Roe's] overblown and discriminatory OFP prevents me from coming to campus at all. All I am seeing here is that because [Roe] is a woman, and because she met with you in-person and presented a sob story, that you found her baseless allegations of physical abuse to be worthy of investigation. And that by contrast, as my rights are being continually violated and my life/the life of those around me threatened, you don't feel compelled to act.

This is disappointing. Please let me know when we can meet. . . . You should not have given [Roe] direct access to the e-mails that I sent you regarding my safety without initiating a formal complaint. This is borderline ineptitude and I will be taking proper action to complain about your and Andrew's inability to proceed according to protocol. It is your job to enforce this policy and I have now learned that *it was YOUR inaction that emboldened [Roe] to continue sending threatening and slandering messages to myself and others. You should have stopped her.* I am an adult living with a disability who struggled endlessly to evict an abusive woman and you by all indications are biased in her favor. We should discuss this in person so that I can finally file a 'real' complaint. I have a lot of time this week and look forward to chatting with you soon.

A0512–A0513 (emphasis in original).  Farganis replied that same day, stating that he and Wells "would welcome the opportunity to meet with [Olson] in person at [Olson's] lawyer's officer later th[at] week" and asked for days and times that worked for Olson. A0521–A0522.  It is unclear whether Olson responded to this email or took Farganis up on the offer to meet.  But in response to an email chain regarding the extension of Olson's deadline to file evidence in Roe's Title IX process, Olson shared more frustrations. A0535–A0536.  He wrote:

When [Roe] came to your office to spin a tale about abuse, you opened an investigation for her immediately. I have sent you email after email after email of formal policy violations enacted by [Roe]. YOU SIMPLY SAT [ROE] DOWN, HANDED HER THOSE MESSAGES, AND ALLOWED HER ABUSE TO CONTINUE/ADAPT. There is no precedent for this. You have not only blatantly favored [Roe's] lies, and suggested my conduct 'required an investigation,' but you have refused to act on the DOCUMENTED violations of policy that [Roe] has instantiated since November. For five months you have refused to help me, claiming an 'in person meeting' is needed for the college to recognize a policy violations. I HAVE TOUCHED BASE WITH FOUR OTHER COLLEGE TITLE

> IX COORDINATORS AND YOU ARE WRONG AND
> YOUR ACTIONS ARE SUBJECT TO LEGAL ACTION. It
> is discriminatory and unsafe that your choice to continually
> update [Roe] about my complaints against her, rather than
> opening an investigation, was your course of action. Tell Sarah
> to call me and quit sending me snippets from the student
> handbook. Me and my lawyer will be in touch.

*Id.* Farganis responded with a lengthy email on February 19. A0531–A0535. This email

sought to "clarify any misunderstandings about the College's process and the College's

response to [Olson's] allegations." A0531. In relevant part, he wrote:

> In the course of our email communications, you have made a
> number of allegations about [Roe]. Most of those allegations
> were general in nature, and lacked the kind of specificity and
> detail that we need in order to conduct a thorough investigation
> and determine whether any policies may have been violated.
> This is why I asked on multiple occasions for you to provide
> more details about these allegations. You declined to provide
> me with any additional specifics or details, but you continued
> to ask the College to move forward with a process to respond
> to your allegations. Therefore, the only option available to me
> was to meet with [Roe] to investigate your allegations as you
> had relayed them in your emails.
>
> Prior to meeting with [Roe], I let you know in a January 5 email
> that we would be taking steps to respond to your allegations.
> To be clear, the function of that meeting was not to "hand her"
> your complaint, but rather to get her response to your
> allegations. When a student is accused of a policy violation,
> part of the process is to give them a chance to respond to that
> allegation. Just as the investigator has given you an opportunity
> to respond to [Roe's] allegations against you, I met with [Roe]
> to give her an opportunity to respond to your allegations. Based
> on [Roe's] responses and the information you have provided,
> the College currently does not have sufficient evidence to
> determine it is more likely than not that [Roe] violated College
> policy.
>
> To help you understand this aspect of the process more fully, I
> have compiled a list of the allegations you have made in your

> emails (in bold). Below each allegation, I have included some
> sample follow-up questions. These are precisely the same
> kinds of questions we would ask of any reporting party in the
> initial stages of an investigation into potential policy
> violations, and they are the same kinds of questions we asked
> [Roe] before moving forward with her formal complaint.

A0531–A0535. Farganis then provided specific follow-up questions relevant to the general

allegations Olson had asserted. A0532–A0534. Farganis then explained: "Simply put,

unless we gather more specific information related to your allegations, there is nothing

more the College can do to investigate those allegations. You can provide that information

to me or another member of the Title IX team in person, by email, or both." A0534.

Olson sent three response emails within the hour of Farganis's email. A0530–

A0531. Among other things, Olson wrote:

> [Roe's] behaviors not only explicitly violate the no-contact-
> directive but constitute harassment and stalking. Macalester's
> entire Sexual Misconduct Policy contains line after line of
> violations that [Roe] has enacted. I have already provided you
> with several examples of these and you have neglected to
> follow through. I have told you that for several months [Roe]
> continued to live in my apartment, off-lease, without my
> consent. I have told you that she destroyed the lock on my front
> door in an effort to continue gaining entry. I have told you that
> she threatened to throw my medication away and, on at least
> 300 occasions, questioned my sanity. Primarily, [Roe] has
> continued to harass women who YOU WILL NOT DEFEND
> BECAUSE THEY ARE NOT A PART OF THE
> MACALESTER COMMUNITY. You and your entire office,
> as well as the Dean's office, has made an ongoing choice to
> support [Roe's] abuse and deny my claims. If I were a woman
> you would be treating my allegations seriously, is what your
> behaviors have explicitly indicated. Dion, you have yet to
> explain to me why you are preferring [Roe's] complaints over
> mine. . . . Get your act together. For the safety of other students
> you might encounter in the future I beg of you that you consider
> a different career path.

*** 

And if someone can offer clear explanation that in fact mentally ill men are not worthy of the same basic protections that women are, so be it. Maybe one of you are more aware of 'higher rights' that white women have in these Sexual Misconduct claims than mentally ill men do. . . . So I must have missed a memo – why are you supporting her, a white woman, and not me?

***

[Roe] destroyed the lock on my door because she was and is a manipulative, controlling abuser. [Roe] destroyed the lock on my door because she wanted to cause property damage and enter my apartment without my consent. Is that clear enough for you, Dion, or do you need a special sit-down? If she were to walk up to my front door she could enter just fine. How many clear examples [of] abuse do I have to offer to you before the message enters your brain? If I had a vagina would you take [Roe's] actions seriously?

A0530–A0531.

The record does not indicate whether Farganis responded to these emails.  But on February 21, Olson responded to Wells's previous email from January 6, writing that "Dion is not investigating any of my claims or taking them seriously" and asserting that Roe and her attorney's alleged threat of legal action on December 6 "was a documentable violation of policy and that you should have been investigating [Roe] since the moment I brought this to your attention, and that having this information should have prompted that from you as a part of your legal obligation to the duties of your job."  A0541 (emphasis omitted).  Wells responded by copying Farganis on the email and providing times for Farganis, Wells, Olson, and Olson's advisor "to meet in person to discuss the complaint [Olson] wish[es] to file against [Roe] to ensure [Olson] [has] a full and accurate understanding of [his] rights under the law and under the campus policy."  A0540.  Instead of setting up a time to meet,

34

Olson responded with more accusations that Wells and Farganis "have failed to take [Olson's] complaints seriously and have supported [Roe's] completely false narrative of abuse." A0539. Olson told Wells in his email that "[y]ou are inept and Dion is inept, & as we both know Dion is a mere coordinator with zero accountability." *Id.* Olson continued: "With all the love I have in my heart for this community I want to say, in clear and simple terms, that you are fucking up. Relaying any further complaint to you, in-person or not, would be like stapling it to a tree." *Id.*

On March 4, 2020, Olson and his attorneys met with Macalester's Assistant Vice President for Student Affairs and Dean of Students, DeMethra LaSha Bradley, and Macalester's Deputy Title IX Coordinator, Jody Gabriel. A0609. This constituted Olson's intake meeting. *Id.* In a post-meeting follow-up email, Bradley again informed Olson that he may file a complaint under the College's Sexual Misconduct Policy. A0609–A0610. She explained that "[f]iling a formal complaint is the first step in the College's formal complaint resolution process. The College would then move forward with an investigation using an impartial investigator." A0609. That same day, Olson responded to Bradley's email stating, "[he] would like to move ahead." *Id.* Bradley also told Olson that, though the College's policy only allows a student to have one advisor during the Title IX investigation, the College was willing to make an exception for Olson. A0610. She asked him to have both advisors sign the advisor agreement if that was how Olson wanted to proceed. *Id.* Olson's attorneys/advisors responded that they would sign and return the advisor agreement. A0609.

On March 19, Bradley sent Olson a draft complaint summarizing Olson's report to her at their March 4 meeting.  A0627; ECF No. 98-1 at 76–78.  She asked him to review and approve the complaint and notify her if there was anything else he preferred to include in his complaint.  A0627.  It is unclear if Olson responded to Bradley.  But as of March 29, Olson still had not provided Macalester an updated and approved complaint.  A0642.  An email to Olson communicated "that the College is prepared to move forward with an investigation of your complaint against [Roe].  We are currently waiting for you to provide an updated complaint."  *Id.*  Olson responded on March 30:

> [S]end the f*cking letter to start the TItle [sic] IX investigation TODAY. Send it NOW. I will update Demethra's woefully brief statement once the investigation has gotten started. Demethra asked for my final confirmation to begin this process WEEKS AGO and I can update her once this shit has gotten started.
>
> If any of you had done your job you would have started investigating [Roe] in November, when her harassment and lies began. For reasons obviously related to my mental illness you have continued to question my sanity, demand more information, and continually place [Roe] outside of the scope of ANY accountability.
>
> Send the fucking letter. Please? Why do you continue to wait? I am not able to edit Demethra's incomplete statement until it is at least put forth. You people have enabled [Roe] in destroying my life and I feel that everyone reading this email knows I'm as good as expelled or in jail already. Her accusations will not stop because your help will not start. My safety, education, and sanity depend on it. Start the fucking investigation.

A0633–A0634; A0641.  Farganis responded that same day:

> We will move forward with noticing [Roe] of your complaint and will proceed with an investigation.  As you know, based

> on your email from March 23, 2020, we had been waiting for
> you to send an updated complaint.  Based on your request in
> the email below, however, we will move forward based on the
> information in the current version of the complaint.

A0641.

On March 31—the day after Olson confirmed his intent to move forward—Roe was

notified of Olson's formal Title IX complaint against her.  A0651.  In an email chain on

that same day about the rebuttal period for Roe's complaint, Olson wrote, "[i]s there any

chance your office could initiate step #0 in my complaint before moving along with step

#956 in [Roe's]." A0656.  A Macalester official (using the Macalester Title IX Coordinator

email account) responded, "[a]s I indicated in my 7:07 pm email yesterday, we are moving

forward with the investigation of your complaint against Roe.  I am meeting with [Roe]

this afternoon to discuss the complaint and will then send you more information about the

appointment of the investigator, which is the next step in the process." *Id.*  Six minutes

later, Olson sent a string of emails in response, which included in part:

> Just send [Roe] and myself the goddamned email indicating
> and documenting the start of the complaint. Why do you
> clowns keep 'meeting with her' whilst lecturing me about the
> 'steps in the process?' Begin the documented, serious,
> evidenced effort. Send the fucking letter.
>
> ***
>
> Do you people just schedule face-to-face meetings with [Roe]
> each time I send you complaints or evidence? START THE
> FUCKING INVESTIGATION. SEND THE LETTER. SEND
> THE EMAILS. YOU OFFERED TO A MONTH AGO. STOP
> OFFERING    [ROE]    OPPORTUNITIES    TO
> MEET/CONVENE WITH YOU WHEN I DO NOT HAVE
> THOSE OPPORTUNITIES. Hurry up.
>
> ***

> You are abusing me and offering [Roe] opportunities that I do not have. Send out the fucking letter. I will continue emailing you until you do so.
>
>                 \*\*\*
>
> Send the fucking letter like you promised a month ago
>
>                 \*\*\*
>
> Send the fucking letter. Stop granting [Roe] these meetings wherein she is given unfiltered access to my complaints and send the fucking letter. Make known publicly the onset of this investigation. Hurry.
>
>                 \*\*\*
>
> Send the fucking letter. Hurry.

A0654–A0656.  Farganis responded about an hour later, informing Olson that the notice of his complaint had already been sent earlier that day, and that the purpose of the call with Roe was to inform her of the complaint resolution process—*i.e.*, the same call Farganis had with Olson regarding Roe's complaint.  A0654.

That same day (March 31), Farganis informed Olson that an investigator, Caitlin Miles, had been assigned to his case.  A0677.  Miles was an attorney at Lathrop GPM and part of the trainED division, as Duniway was.  A0676.  In his email, Farganis notified Olson that he had until April 2 to raise any conflict-of-interest concerns.  A0677.  On April 3, Olson emailed concerns about Miles being employed by the same firm as Farganis and Duniway.  A0676–A0677.  Farganis responded to Olson, noting that Olson had responded after the deadline and explaining that Macalester has outsourced its Title IX investigations to trainED for the last several years.  A0676.

On April 17, Olson emailed Miles and told her that Macalester sent "an incomplete complaint/the wrong complaint" and "the letter of 3/30 that the college sent [Miles] only contains a small fraction of that information."  A0772.  Though Olson also told Miles that

"[t]he college will be sending [her] a fuller list of complaints in the coming days," *id.*, no record evidence shows that the College agreed to edit or add to Olson's own complaint. Miles continued to try to schedule an interview with Olson over the following weeks, but Olson either failed to respond or claimed that he was too unwell to meet.  A0762–A0773.

On April 28, Farganis emailed Olson to update him on the adjudication of Roe's complaint.   A0684.   In response, Olson stated that Macalester "failed to act on the complaints [he] brought to [the College] in November until the very end of March. It took [Macalester] over 120 days to initiate a complaint against [Roe] after [he] brought serious evidence to [the College]."  A0684.  He also alleged that Macalester was "using a public health crisis to cover [its] ass."  *Id.*  Farganis responded the same day:

> With regard to the timing of your complaint against [Roe] please bear in mind that we tried for several months to get your cooperation on establishing allegations sufficient to move forward with a complaint. Ultimately, despite not having the information that we requested, we moved forward with your complaint and agreed to supplement it as needed based on information that you might provide to the investigator. To that end, please provide Caitlin Miles with the information that she requested in her most recent email to you so that we can continue to move forward with the complaint resolution process expeditiously.

A0683.  Olson disagreed with Farganis's characterization.  A0682.  He claimed that he had provided Farganis "with sufficient evidence of allegations starting [in] November" and that Farganis, Wells, and DeMethra "had fucked up [their] basic duties."  *Id.*  Additionally, he claimed that the Title IX "office tends to support women and not men, and that [it] did not find [his] complaints credible because of [his] mental illness."  *Id.*

On May 5, Miles told Olson that she planned to move forward with the witness interviews that week.  A0767.  Olson responded that "[i]t is not appropriate to force the investigation along (starting interviews this week…) without taking into account that I am very very sick right now and that it is reasonable for documented disabilities to impact the regular process."  *Id.*  That same day, Farganis replied to Olson's email and explained:

> Please know that we are very mindful of your ongoing illness, and that we are simply trying to move the investigation forward as expeditiously as possible without creating additional stressors for you.

A0766.  On May 14, Olson reached out to Miles inquiring about the status of his complaint since he had by then been expelled.  *Id.*  Miles told Olson that her Title IX investigation into his complaint was ongoing and offered to speak with him via Zoom about related substantive information.  A0765.  Olson told Miles he would reach out to her that night or the next day about finding a time to meet, but he did not.  A0764.  Miles sent Olson a follow-up email a week later, on May 21.  On May 23, Olson replied to Miles, explaining that he had been "very very sick" and "close to hospitalization."  A0763.  He said that he would update Miles in the following days on whether he is "able to have a coherent conversation."  *Id.*  Olson, again, did not reach out to Miles as he indicated.  A0762.  Miles sent another follow-up email on May 29.  *Id.*  She explained that she was moving forward with the second round of party interviews and asked for his availability, assuming he had no other suggested witnesses.  *Id.*  Olson responded several days later, writing that he was assembling a list of witnesses he would send to Miles that afternoon.  *Id.*  The record does not establish that Olson provided this list.  Between April and June, Miles conducted

interviews of Olson, Roe, and eight other individuals suggested by the parties.  A0822–A0823.

On June 15, Miles emailed Olson to let him know about the close of evidence date and to again encourage him to meet with her before that deadline.  A0790.  She informed him that she may not be able to meet with him after that date due to an extended leave of absence.  *Id.*  Olson responded about two hours later that he was "very unwell," "struggling with suicidal ideation," and "considering checking [himself] into a psych ward."  A0789–A0790.  He also stated that "[u]p until this point a lot of unfair demand has been placed on [his] illness and symptoms even though reasonable extensions can be accommodated."  A0789.  Miles replied by reiterating her potential unavailability to interview him later, and she "strongly encourage[d]" him to meet with her that day or the next day.  *Id.*  The next day, June 16, Olson sent a lengthy email to Miles, copying Farganis and his attorneys.  In part, the email stated:

> I informed you that I was experiencing a crisis due to my disability, and requested a reasonable accommodation of an extension of a couple of days of the evidentiary period to recover. Instead of engaging with me or granting my request, you simply stated that I am encouraged to speak with you while I'm in crisis. Obviously, when I requested a reasonable accommodation I was speaking with you while in crisis. Upon hearing someone with a deadly disease is in crisis it is your role to respond by accommodating. Your response, however, is the equivalent of completely ignoring my request and essentially telling me to get over it for your convenience and the convenience of Macalester. I am especially puzzled by this reaction given how long and how frequently Macalester has delayed the process in the past without notifying me of the reasons for the delay, including ignoring my request that [Roe] be investigated back in November 2019. Macalester opted to

41

delay any investigation of my complaint until after [Roe] was allowed to graduate and after expelling me.

A0798.  Miles responded:

> I am sorry to hear what you are experiencing and I hope that you are getting the help and support that you need.  I understand that you are feeling frustrated with the process, please understand that my intention has been to ensure that you have an opportunity to participate in a follow-up interview with me.  I also know that you have expressed repeated frustration with how long this process has taken and so I have been working to complete the investigation as expeditiously as possible.  To that end, I set the close of evidence date for Wednesday, with the only outstanding item being your follow-up interview which I have been trying to schedule for some time.  While I may normally have flexibility on the timing of interviews, I wanted to let you know that due to my upcoming leave, my availability beyond Wednesday is uncertain and outside of my control.  Because my leave will be for a minimum of four months, waiting to interview you until after I return from my leave is not a viable option.  In your email from last night, you left open the possibility that you may be able to participate in an interview before the close of evidence, which is why I suggested that, if possible, you try to schedule a time with me Tuesday or Wednesday.

A0797.  Olson again asked for an extension of the evidentiary deadline.  A0795–A0796.

On June 18, the next day, the College asked Olson to identify the length of additional time he was requesting and for documentation from his medical provider to support his extension request.  A0795.  Olson did not respond.  On June 22, Macalester followed up with Olson.  A0794.  The email summarized Olson's communications with Miles up to that point, provided an extended deadline for him to support his request, and to correct some inaccuracies in Olson's email:

> The College is not able to continue to delay the close of evidence indefinitely.  By Wednesday (June 24) at 5:00 p.m.,

please provide us with a specific amount of time that you are requesting and supporting documentation from your medical provider so that we can consider your request for an accommodation. If we do not receive that information before that time, we will not be able to consider your request for an accommodation and the process will move forward.

We also want to address two inaccuracies in your June 19 email to Ms. Miles, on which we were copied. First, your email states that Macalester did not begin its investigation into your allegations against [Roe] until ten weeks ago. This is not correct. The College began its investigation into your allegations against [Roe] several months ago. Ms. Miles began her investigation roughly ten weeks ago, only after you indicated that you were no longer reluctant to move forward with a formal complaint and we determined that there was a sufficient basis to do so.

*Id.*

Olson responded on June 24. He "demand[ed] 4 weeks' extension of this investigatory period" and accused Macalester of "arbitrarily continu[ing] to ignore [his] serious illness." A0792–A0793. Macalester granted the four-week extension the next day, which moved the close of evidence date to July 15, 2020. A0792. The College also offered to allow written responses with Miles instead of a typical in-person interview. *Id.* On July 10, five days before the new evidence deadline, Olson asked for written numbered questions in lieu of an in-person interview, an extension of 10 additional days past the first extended deadline, and access to his previously submitted evidence. A0816–A0817. The College granted the written interview request, granted the extension, and offered to allow him access to his initial interview with Miles. *Id.* Macalester offered a time for Olson to listen to the interview audio. A0815. Olson replied three days later, July 20, and said the

43

suggested time did not work for him because he was "not doing well and will not be up or available during the day tomorrow." *Id.* He did not suggest an alternative time. *Id.*

On October 16, 2020, Miles submitted the confidential investigative report for Olson's Title IX complaint. A0820–A0870. Macalester shared the report with Olson that same day and asked for his availability to review the file via Zoom. A0874–A0875. Olson did not respond. Macalester sent a follow-up email on October 20, again asking for his availability to review the file and reminding him of the deadline to submit a written response, which was October 24. A0874; A0878. Olson replied later that day, asking for a copy of the investigation report and all the evidence. A0873–A0874. He cited new federal regulations as of August 2020 as the basis for this request. *Id.* Macalester then explained that, in its view, Olson's complaint was governed by the policy and regulations in place at the time of his complaint, March 2, 2020, and under that policy, parties were permitted to review the investigation file while supervised by a Title IX official. A0873. Macalester extended the time to review and submit a written response to October 27 and offered to accommodate Olson's schedule, even if that required multiple viewing sessions. *Id.* Olson and Macalester then set up a review session via Zoom for October 26. A0872–A0873. Olson and his advisors reviewed the investigation report on October 26. A0878–A0879.

Owing to Olson's statements that he would need more time to submit a written response, Macalester again pushed back Olson's response deadline, this time to November 2. A0878. The College requested Olson's availability to schedule additional review sessions. *Id.* But Olson did not respond. Macalester sent a follow-up email on

October 28 asking if Olson would like to arrange more review sessions.  A0877–A0878.

It also reminded Olson that if his new attorney, Michael Allen, would like to serve as his

advisor, the College needed an unmodified and signed advisor agreement.  A0877.  Olson

responded, asking to set up a review session for the following day, October 29.  A0877.

On November 2, Olson submitted a written response with exhibits.  ECF No. 99-1; *see*

A0881.  Because he attached exhibits, which was not allowed as part of the written

response, and exceeded the word limit, the College gave him until November 7 to edit his

written response in accordance with the College's guidelines.  A0881.  He submitted his

amended written response on November 9.  A0883.

Under the College's policies at that time, each party to a Title IX investigation was

allowed a two-day period during which they could review each other's statements and

submit a rebuttal statement.  A0894.  Olson was informed of this opportunity on

November 9.  *Id.*  The College offered to arrange Zoom sessions during the rebuttal period

and again reminded Olson that any chosen advisor must properly execute the Macalester

advisor agreement without modification before the advisor may join any review session.

*Id.*  Olson's advisor apparently refused to sign the advisor agreement because he "refuse[d]

to waive any rights under Title IX, its regulations, or state and federal law."  A0893.

Macalester extended the rebuttal period to November 16.  *Id.*  Olson pushed back and

demanded that Macalester accommodate his request for copies of his file and to allow his

advisor to proceed without signing the agreement.  A0892.  On November 14, Olson asked

to schedule a review session for the following day with his advisor.  A0891.  The College

confirmed the review session but explained that an advisor would only be permitted to

participate in the review session if an advisor agreement was properly executed. A0891. Olson participated in the review session on November 15. A0897. Three minutes and thirty seconds into the Zoom review session, Olson's account was suspended because he had turned off his camera. *Id.* The review process requires supervision by a Macalester official; without his camera on, Olson could not be supervised. *Id.* Olson was then instructed to exit all windows, to which he replied, "No thanks." *Id.*

Though Olson had only minutes to review Roe's written response, his rebuttal statement "quotes extensively" from her response, prompting the College to be concerned that he took screenshots or photos that allowed him to view the response outside of the supervised review session. *Id.* The College emailed Olson about this incident on November 20 and allowed him to provide a response to this issue by November 21. *Id.* Olson responded the same day. *Id.* He did not admit or deny the allegations but rather pushed the College to send him copies of the investigative materials and accused it of "restricting [him] and [his] advisor's access to the investigation report and evidence" or excluding Olson's responses. *Id.* It is unknown whether any subsequent correspondence regarding this incident occurred.

On December 8, 2020, Curran sent a lengthy email to Olson informing him that "[t]he College has determined that it will not continue the complaint resolution process for [his] complaint dated March 4, 2020 against Roe." A0900–A0902. She wrote, "this decision was made based on the fact that neither of you are currently students at the College and the College's recent conclusion that you violated the rules of the supervised review of investigation materials." A0900. The email is reproduced here in full:

| From: | Macalester Title IX Coordinator Account |
| --- | --- |
| Sent: | Tuesday, December 8, 2020 12:00 PM CST |
| To: | Ian Olson |
| BCC: | Dion Farganis |
| Subject: | Important information regarding Title IX complaint |

Ian,

The College has determined that it will not continue the complaint resolution process for your complaint dated March 4, 2020 against ▓▓▓▓▓ As discussed below, this decision was made based on the fact that neither of you are currently students at the College and the College's recent conclusion that you violated the rules of the supervised review of investigation materials.

Since the complaint resolution process began over 8 months ago, the status of the parties and their relationships to the College have changed. In May 2020, you were expelled from the College and banned from campus and from College functions or events without prior approval after College adjudicators found sufficient evidence to determine it was more likely than not that you engaged in conduct constituting domestic violence, stalking, and sexual harassment in violation of the College's Sexual Misconduct Policy. In addition, in August 2020, ▓▓▓ completed the coursework needed for her to graduate from the College.

As documented in numerous email communications between you and the College between November 2019 and March 2020, the College provided multiple opportunities during that timeframe for you to bring a complaint against ▓▓▓ However, throughout that period, you declined to provide the College with the information needed to assess your allegations and determine the appropriate complaint resolution process, either in person or in writing. In March 2020, once you provided the College sufficient information to assess your allegations and determine an appropriate responsive process, we promptly moved forward with the complaint resolution process under the Policy. Then, as the College made efforts to move the complaint resolution process forward in a timely manner, you repeatedly made requests for additional time, whether it was additional time to provide information to the investigator or additional time to allow you to review and respond. Throughout the process, the College worked with you to accommodate these requests. This included granting significant extensions of timeframes such as a 4-week extension in June 2020 to allow you sufficient time to respond to written follow-up questions from the investigator and a 9-day extension to ensure you had sufficient time to review the investigation report and submit a response. In part because of these requests for additional time, in addition to other unrelated delays during the process, we now find ourselves in a formal complaint resolution process where neither party is a student at the College (one having been expelled more than 6 months ago; the other having completed her coursework at the College more than 3 months ago).

When your status initially changed in May due to your expulsion, because ▓▓▓ was still a member of the College community, we continued to move the process forward. When ▓▓ completed her coursework in August and was therefore no longer a member of our community, we considered whether the College should discontinue the formal process based on neither party being a student at the College. Our initial decision at that point was to continue with the formal process. Your recent violation of the College's review procedures has caused us to reevaluate this decision.

During your November 15, 2020 review session, your online access to ▓▓▓▓ written statement was suspended after less than four minutes of viewing time. The suspension of access occurred when you turned off your camera, which was a violation of the rules of the review session because it prevented the College from supervising your review of the materials. During the session, you were reminded that you needed to keep your camera on in order to have access to the materials. Despite having only a few minutes to review ▓▓▓ written statement while supervised, the rebuttal statement that you submitted quotes extensively from ▓▓▓ written statement, giving the College reason to believe that one of two things happened: (1) you took a picture of the statement in violation of the Policy or (2) you left the window with the statement open after you were instructed to close it at the end of the supervised session

and continued to view it outside of the supervised review. Your exchange with the Interim Title IX Coordinator during the review also supports this conclusion. The Interim Title IX Coordinator informed you that your access had been suspended because your camera was off and that you could email the Title IX Coordinator if you would like to schedule another review session. You responded in part "I got what I need. Thanks though." The Interim Title IX Coordinator then asked you to exit all windows. You responded in part "No thanks."

When the College provided you with an opportunity to respond to the potential violation of the rules of the supervised review, you did not deny that you had viewed the written statement outside the review session; instead, you argued that the College should have provided you with electronic copies of the materials. The College had explained to you on numerous occasions that the applicable Policy does not provide for parties to receive copies of the investigation file or the other party's written statements and that your access to those materials occurred through review sessions supervised by the College. Although the College was willing to arrange multiple review sessions to ensure you had sufficient time to review the materials, you instead reviewed the materials outside of that supervised review in violation of the rules of the supervised review session.

The reason the College limits parties' access of these materials to supervised review sessions is to ensure that no one else is present during the review of these highly confidential materials and to ensure that copies are not made of the materials. These requirements apply to both parties in the process. Your violation of the rules in place to protect the privacy of the parties is highly concerning. The College also notes that you had exchanged multiple emails with the College about wanting your attorney advisor to be present at the review session. The College repeatedly explained that you were welcome to bring an advisor, but the advisor first needed to sign the College's advisor agreement. Your potential advisor made material modifications to the agreement before signing it, so the College asked you to have him sign a version of the agreement that was not modified – as is required by the Policy. You did not do so. Your violation of the rules of the supervised review is particularly concerning because it seems designed to get around the College's requirement that your advisor sign the advisor agreement prior to participating in the review session.

Based on this serious violation of the review procedures, the College has reevaluated the decision to move forward with the complaint resolution process. The scope section of the College's applicable Sexual Misconduct Policy (the "Policy") indicates that the Policy applies to "Macalester College community members" as well as certain other conduct occurring on College property, at College events, or which may cause an unacceptable disruption at the College or interfere with an individual's right to a non-discriminatory educational or work environment. Due to the parties' changes in status, neither party is currently considered a Macalester College community member and much of the conduct alleged in your complaint no longer falls within the Policy's scope. Further, under the Policy, "[w]here it is not possible or practical to follow this procedure, the College reserves the right to modify the procedure or to take other administrative action as appropriate under the circumstances." And while, as the College has previously communicated, the Title IX regulations effective August 14, 2020 do not apply to this matter, the College notes that the regulations allow for an institution to dismiss a Title IX complaint when, as is the case here, the respondent is no longer enrolled or employed by the institution. Accordingly, in light of the fact that neither party is currently a member of the College community, coupled with your serious violation of the rules of the supervised review session, the College has determined that it will not continue forward with a formal complaint resolution process.

The College is still, however, evaluating what we need to do in response to your complaint in order to promote safety for our campus community. This analysis is consistent with what our response would be if the College received your complaint today, when neither party is currently a member of the College community. Although in that case the College would not engage in a formal complaint resolution process including an investigation and adjudication, the College would consider what response was appropriate to protect the campus community. In light of the information we have gathered from you during the investigation, we do not anticipate needing any further information from you as we determine an appropriate response, such as whether any community remedies might be appropriate under the circumstances.

As we've mentioned previously, there is a list of support resources in the College's policy. Please let us know if you have any questions about the resources available to you.

Sincerely,

Regina Curran
--
**REGINA D. CURRAN, J.D.**
Title IX Coordinator & Nondiscrimination Officer
titleixcoordinator@macalester.edu
Title IX at Macalester: https://www.macalester.edu/titleix/
*she/they*

1600 Grand Avenue
Saint Paul, MN 55105 USA

 MACALESTER

A0900–A0902.  The record contains no subsequent communication between Macalester and Olson.

E

*Olson's Claims In This Case*

Olson filed this case on July 8, 2021.  *See* Compl.  He asserted claims across five counts in his Complaint: (1) a claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, alleging that Macalester acted with deliberate indifference to Olson's credible allegations of harassment, stalking, and abuse by Roe, and that Macalester's investigation and punishment of Olson reflected gender bias; (2) claims under Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12182, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, alleging that Macalester discriminated against Olson on the basis of his disability; (3) a breach-of-contract claim under Minnesota law, alleging that Macalester's Student Handbook and Title IX policies were contracts and that Macalester breached those contracts during its investigation of Roe and Olson's

complaints; (4) a claim for breach of the implied covenant of good faith and fair dealing under Minnesota law derived from the breach-of-contract claim; and (5) a negligence claim under Minnesota law, alleging that Macalester's investigation breached its "duty to fairly and equitably investigate claims of harassment and misconduct, without bias or discrimination." *See* Compl. ¶¶ 239–84.

## II

Before Macalester's summary-judgment motion can be resolved, the universe of potentially relevant facts must be determined. Macalester moves to exclude the testimony of two of Olson's experts: Susan Brandon, as to her opinions regarding flaws in Macalester's investigations and thus whether these asserted flaws show that the investigations were unworthy of credence; and Frank Dattilio, as to his opinions regarding a variety of matters including Olson's mental illness, Roe's awareness of it, the flaws associated with Macalester's response to Olson's mental illness and the impact Macalester's investigations had on Olson, and Olson's employability. Dr. Brandon's testimony will be excluded. Dr. Dattilio's would be admitted only to the extent it concerns his diagnoses of Olson; it will be excluded in all other respects.

## A

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). "District courts have wide latitude in determining whether an expert's testimony is reliable." *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007). The Eighth Circuit has identified a number of factors courts may consider in determining whether an expert's testimony is the product of "reliable principles and methods," including:

> (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.

*Smith v. Cangieter*, 462 F.3d 920, 923 (8th Cir. 2006). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). As long as the evidence indicates that the expert evidence is reliable and relevant, "no single requirement for admissibility" governs. *Id.* "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "As a general rule, the factual basis

of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quotation omitted). But the court must exclude an expert's opinion if it "is so fundamentally unsupported that it can offer no assistance to the jury." *Id.* at 929–30 (quotation omitted). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). Furthermore, "under *Daubert* and Rule 403 of the Federal Rules of Evidence, the probative value of the expert testimony must not be substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." *United States v. Solorio-Tafolla*, 324 F.3d 964, 966 (8th Cir. 2003).

### B

Susan Brandon is the first of Olson's experts whose testimony Macalester seeks to exclude. She holds a Ph.D. and M.A. in psychology and cognitive neuroscience from the University of Hawaii and a B.A. from City University of New York. ECF No. 89-2 at 3. Dr. Brandon's expertise focuses on interviewing and interrogation in intelligence, criminal, and legal contexts. *Id.* at 2. She has "18 years' experience providing instruction and coaching on the use of science-based communication methods to local and federal law enforcement and intelligence agencies and departments of the U.S. government." *Id.* The groups she has worked with include the New York and Los Angeles police departments, the United Kingdom's MI-5 and MI-6, the U.S. State Department, the Department of Homeland Security, and the Secret Service, among others. *Id.*

Dr. Brandon offers four opinions in her report: (1) that interviewers were biased against Olson based on his sex, ECF No. 89-1 at 3; (2) that the interviews "provided evidence that showed [Olson] more credible [sic] than Jane Roe," but the investigation reports did not reflect this conclusion, *id.*; (3) that "interviewers did not use best practices of interviewing techniques . . . and [were] ill-informed about the science of interviewing," *id.*; and (4) that Roe "adopted and offered a 'victim narrative' that has become familiar to the public, the criminal justice system, and especially to college campuses," and that Macalester's training materials and investigation unfairly accepted Roe's narrative, *id.* Dr. Brandon based these opinions "primarily on analyses of audio records of interviews with [Olson] and Jane Roe," though Dr. Brandon also reviewed documents. *See id.* at 4, 43–46.

Dr. Brandon's opinions will be excluded. The reasons for this decision vary somewhat depending on the specific opinion Dr. Brandon would offer. Dr. Brandon's opinion that the individuals who investigated Roe and Olson's complaints did not use "best practices of interviewing techniques," *id.* at 3, deserves exclusion because the opinion is not reasonably tethered to the legal standards by which Olson's claims must be judged. No doubt Dr. Brandon has expertise in, as her resume describes it, "the science of communication applicable to information collection (interviewing and interrogation) in intelligence, criminal, and legal contexts (e.g., criminal interviews, corporate amnesty, depositions, plea agreements, debriefing witnesses and victims)," or that she has "18 years' experience providing instruction and coaching on the use of science-based communication methods to local and federal law enforcement and intelligence agencies and departments of the U.S. government." ECF No. 89-2 at 2. The problem is that no legal authority holds

or suggests that the (mostly law-enforcement related) interviewing best practices against which Dr. Brandon assesses Macalester's investigations apply in the context of Olson's claims.  Olson cites no authority, for example, suggesting that a college might be held liable under Title IX for failing to comply with the best practices Dr. Brandon identifies.  From Macalester's perspective, the Title IX bar just isn't that high.  Under Title IX, an inference of sex discrimination may be justified if an investigation "result[s] in findings so devoid of substantive content as to be unworthy of credence" or is marked by "clear procedural irregularities."  *See Rossley v. Drake Univ.*, 979 F.3d 1184, 1193 (8th Cir. 2020) (quotation omitted).  Regardless, what probative value Dr. Brandon's best-practices testimony might hold in relation to the applicable legal standards is outweighed considerably by a risk that a jury would be confused or misled into thinking that the best practices Dr. Brandon describes set the bar, meaning the better answer is to exclude this opinion under Fed. R. Evid. 403.

Dr. Brandon's opinions that that interviewers were biased against Olson based on his sex and that the interviews "provided evidence that showed [Olson] more credible [sic] than Jane Roe" deserve exclusion because they aren't based on expertise.  Dr. Brandon identifies no reliable principles or methods she applied to reach these opinions.  Dr. Brandon's opinion that interviewers displayed bias based on Olson's sex seems to follow from the flaws she identified with Macalester's investigations and interviews, but Dr. Brandon does not identify what method she applied to determine that these flaws proved bias based on sex as opposed to a non-bias-related explanation.  Similarly, Dr. Brandon does not identify what principles or methods she applied to determine that Olson was "more

credible" than Roe.  These problems aside, it is unclear how Dr. Brandon's testimony regarding these opinions would help a jury "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  Lay juries routinely assess questions like the presence or absence of bias or the credibility of witnesses without expert testimony.  The better answer is that a jury would not benefit from Dr. Brandon's testimony or expert knowledge to understand or resolve these questions here.

Dr. Brandon's opinions that Roe "adopted and offered a 'victim narrative' that has become familiar to the public, the criminal justice system, and especially to college campuses," and that Macalester's training materials and investigation unfairly accepted Roe's narrative, ECF No. 89-1 at 2, warrant exclusion because Olson does not identify what scientific, technical, or other specialized knowledge Dr. Brandon possesses that might enable her to opine regarding these matters.  Dr. Brandon's resume makes clear that she is an expert in the areas of "interviewing and interrogation[] in intelligence, criminal, and legal contexts" and teaching interviewing and interrogation best practices to "law enforcement and intelligence agencies and departments of the U.S. government." ECF No. 89-2 at 2.  Dr. Brandon's resume discloses no education, training, or experience in the area of identifying a "victim narrative," assessing the prevalence of that narrative on a college campus, or determining whether an educational institution's policies are premised on accepting that narrative.  Dr. Brandon's deposition testimony confirmed that her "victim narrative" opinion is not derived from her particular expertise, but rather was "based on [her] reading literature studies about victim narratives and studies on college campuses" and being "exposed to analyses in the media about these issues." ECF No. 89-3 at 60; *see*

*Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006) ("Rule 702 does require that the area of the witness's competence matches the subject matter of the witness's testimony.") (quotations omitted).  The bottom line, then, is that Dr. Brandon's testimony will be excluded in its entirety.

<div align="center">C</div>

Macalester also seeks to exclude Olson's psychologist expert, Frank Dattilio, Ph.D.  Dr. Dattilio is a licensed clinical and forensic psychologist.  *See* ECF No. 89-5.  He holds a B.A. in psychology from Allentown College (now DeSales University), a M.Ed. in counseling education from Kutztown State College (now Kutztown University), and a Ph.D. in clinical psychology from Temple University.  *Id.* at 1.  Dr. Dattilio completed two post-doctoral fellowships at the University of Pennsylvania School of Medicine, one in cognitive therapy and the other in advanced forensic psychiatry.  *Id.*  Dr. Dattilio's resume is extensive—it runs 46 pages—and identifies his research and publications, clinical and teaching experience, board positions, volunteer work, interviews, films, podcasts, and more.  *See id.*

Dr. Dattilio offers five opinions in his report: (1) Mental illness caused Olson to be disabled throughout the time he was in a relationship with Roe, and Roe was aware of Olson's disability.   (2) Macalester was grossly insensitive to Olson's mental illness.  (3) Macalester's Title IX investigation process "[c]ompletely [d]estabilized" Olson for a time.   (4) Roe's treatment of Olson was just as abusive as Olson's treatment of Roe, but Macalester did not emphasize the fact in its reports.  (5) Olson would be employable—and

not totally disabled—but for Macalester's decision to expel him.  *See* ECF No. 89-4 at 2–4.

There is an overarching, exclusion-worthy problem with almost all of Dr. Dattilio's opinions: Dr. Dattilio provides no meaningful analysis or explanation to support them.  Dr. Dattilio's report is 41 pages long.  The first three pages and a portion of the fourth page include an executive summary of Dr. Dattilio's five opinions.  *See id.* at 2–5.  The report's remaining pages are merely historical.  They describe Olson's background and mental-health history as told by Olson to Dr. Dattilio, summarize Olson's health care and Social Security disability records reviewed by Dr. Dattilio, recount Olson's version of Olson and Roe's relationship and various incidents that occurred during the relationship, summarize Macalester's investigations and findings, and summarize Dr. Dattilio's findings and conclusions regarding Olson's mental health based on his examination of Olson.  *See id.* at 7–38.  Except to the extent Dr. Dattilio opines regarding his mental-health diagnosis or diagnoses of Olson, the report nowhere describes a connection between these historical facts and Dr. Dattilio's opinions.  And none is apparent.  To phrase the problem in Rule 702's terms, the report identifies no "reliable principles and methods" that Dr. Dattilio might have applied to the facts to reach his other opinions.  Fed. R. Evid. 702(c), (d).  For example, Dr. Dattilio nowhere explains how he determined—from his scientific perspective—that Roe was just as abusive toward Olson, that Macalester did not sufficiently emphasize this fact in its reports, or that Olson's mental-health condition would not be disabling but for the fact that he did not graduate from Macalester.

There are other exclusion-worthy problems with Dr. Dattilio's opinions. It is not clear, for example, how Roe's awareness of Olson's mental illness is relevant to Olson's claims, meaning it is not clear how Dr. Dattilio's opinion concerning Roe's knowledge would help the jury "to determine a fact in issue." Fed. R. Evid. 702(a). Regardless, Roe's knowledge should not be the subject of expert testimony. Juries routinely assess whether witnesses possessed knowledge of facts and the extent of that knowledge without an expert's assistance, and there is no reason to think an expert might be helpful on this issue here. Dr. Dattilio identifies no background, education, or experience in Title IX investigations (or investigations generally), meaning he would not be permitted to testify regarding alleged flaws with Macalester's investigation. And Dr. Dattilio identifies no background, education, or experience in vocational counseling or a similar field. Thus, while he would be allowed to testify regarding Olson's health, he would not be allowed to testify regarding potential occupations Olson might have been capable of performing.

Olson argues that Dr. Dattilio's report reflects a proper methodology and that, in any event, any shortcomings in this regard reflect gaps in the factual basis underlying Dr. Dattilio's opinions, a problem Olson says should be addressed through cross-examination of Dr. Dattilio, not wholesale exclusion. These arguments are not convincing. To defend Dr. Dattilio's methods, Olson points out only that Dr. Dattilio administered a battery of six inventory- or checklist-type tests during his examination of Olson. ECF No. 100 at 21–22. The fact that Dr. Dattilio administered these tests, or the tests' results, might support Dr. Dattilio's opinion that Olson suffered (and continues to suffer) from mental illness, but the fact that Dr. Dattilio administered those tests says nothing analytically to support his other

opinions.  Olson is correct that gaps in an expert opinion's factual basis generally go to the expert's credibility, not admissibility, and that such gaps should be the subject of cross-examination at trial.  *See Masters v. City of Independence, Mo.*, 998 F.3d 827, 841 (8th Cir. 2021).  But the gaps here are not factual.  They are analytical.  For Rule 702's purposes, the gaps are significant because they show the absence of "reliable principles and methods."  Fed. R. Evid. 702(c).  To put it another way, it is not possible here to apply the four factors relevant to the reliability inquiry because each of those factors assumes the presence of a "theory or technique."  *See Smith*, 462 F.3d at 923.  Again, except for his diagnosis of Olson, Dr. Dattilio identifies no theory or technique underlying his other opinions.  Except to the extent it concerns his diagnosis of Olson, Dr. Dattilio's testimony will be excluded.

## III

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255 (citation omitted).  A "smoking gun" is not required for the non-movant to defeat a summary judgment motion.  *Teleconnect Co. v. Ensrud*, 55 F.3d 357, 360 (8th Cir. 1995).  But the non-movant must show "more than mere speculation, conjecture, or fantasy."  *Clay*

*v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 539 (8th Cir. 2014) (citation and quotations omitted); *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 716 (8th Cir. 2019).

<div align="center">A</div>

Title IX prohibits sex discrimination by recipients of federal education funding.  It provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).  An individual claiming injury due to an educational institution's unlawful sex discrimination has an implied private right of action through Title IX.  *Cobb v. U.S. Dep't of Educ. Off. for C.R.*, 487 F. Supp. 2d 1049, 1053 (D. Minn. 2007) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979)).  "Federal courts are not a forum for general appellate review of university disciplinary proceedings.  But Title IX places a specific limitation on the authority of educational institutions that receive federal funds." *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020).[3]

---

[3]    Macalester argues "that college personnel are 'entitled to a presumption of honesty and integrity' and that courts 'should refrain from second-guessing the disciplinary decisions made by school administrators.'"  ECF No. 79 at 21.  In advancing this position, Macalester quotes *Richmond v. Fowlkes*, 228 F.3d  854, 858 (8th Cir. 2000), and cites *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019).  To be clear, I do not understand that Macalester is entitled to these presumptions.  The Eighth Circuit has not applied such a presumption to a Title IX case claiming sex discrimination in discipline, and the cases Macalester cites do not support its argument.  *Richmond* involved only constitutional claims, and there, the court invoked the presumption in response to a claim that a decision-maker was personally hostile to the plaintiff.  228 F.3d at 858.  *Dardanelle School District* also is distinguishable.  There, the court applied Title IX's deliberate-indifference standard to a claim that the district's response to a student's sexual-assault complaint was deficient.  928 F.3d at 724–25.  That standard is not applicable here.

In a series of recent decisions reviewing district court orders dismissing Title IX sex-discrimination claims under Rule 12(b)(6), the Eighth Circuit has made clear that, to plead a Title IX sex-discrimination claim, a plaintiff must allege facts plausibly showing that the recipient of federal educational funding disciplined him "on the basis of sex—that is, because he is a male." *Univ. of Ark.-Fayetteville*, 974 F.3d at 864 (citing *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019)); *Rowles v. Curators of the Univ. of Mo.*, 983 F.3d 345, 359 (8th Cir. 2020); *Does 1–2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 577 (8th Cir. 2021). "To survive summary judgment, then, [Olson is] required to set forth sufficient evidence to allow a reasonable jury to find that [Macalester] disciplined him on the basis of sex." *Rossley*, 979 F.3d at 1192.

Cases demonstrate several approaches a Title IX sex-discrimination plaintiff may take to show that sex was "'a motivating factor in the decision to discipline.'" *Rowles*, 983 F.3d at 359 (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)). A plaintiff may show, for example, that a federal-funding recipient: (1) disciplined similarly situated men and women differently, *see, e.g., Doe v. Dordt Univ.*, 616 F. Supp. 3d 872, 899 (N.D. Iowa 2022); *Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916, 929–30 (S.D. Iowa 2021); (2) held "[b]iases based on stereotypes about women's and men's sexual behavior," *Dordt Univ.*, 616 F. Supp. 3d at 899; *Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909, 927 (S.D. Iowa 2019); (3) countenanced an investigation blighted by "'clear procedural irregularities'" or that "result[ed] in findings so devoid of substantive content as to be unworthy of credence," *Rossley*, 979 F.3d at 1193 (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 35 (2d Cir. 2019)); and (4) reached a decision affected by "external pressures from the campus

61

community and the federal government over a perceived lack of diligence in investigating and expelling students accused of sexual assault," *Regents of the Univ. of Minn.*, 999 F.3d at 578; *see Univ. of Ark.-Fayetteville*, 974 F.3d at 865 ("External pressure on a university to demonstrate that it acted vigorously in response to complaints by female students may support an inference that a university is biased based on sex, although not necessarily in a particular case."). Here, Olson seems to advance two theories to show that Macalester disciplined him on the basis of his sex, but neither theory has trial-worthy evidentiary support.

(1) Olson first advances a selective-enforcement theory. Under this theory, a male plaintiff must show "he received disparate punishment as compared to a similarly-situated comparator and that such punishment was motivated by his sex." *Rowles*, 983 F.3d at 360 (cleaned up); *see Dordt Univ.*, 616 F. Supp. 3d at 899 (recognizing that, to prevail on this theory, a male plaintiff must show that "(1) a female . . . was in circumstances sufficiently similar to [the male accuser's] own, and (2) that the defendant treated this female more favorably"). Olson argues: "Macalester selectively enforced its Title IX policy by letting the female student, Jane Roe, get away with the abuse of Olson (and others on campus), while exclusively punishing Olson, the male student, for substantially the same behavior." ECF No. 95 at 2. Roe, in other words, is Olson's comparator. For Roe to be a comparator, Olson must show that she was "similarly situated to him in all relevant respects." *Rowles*, 983 F.3d at 355.

No reasonable juror could find that Olson and Roe were similarly situated in all relevant respects. To show that he and Roe are comparators, Olson focuses on record

evidence showing that the two were in a relationship and were equally "committed to consensual rough sex."  ECF No. 95 at 4.  Olson also asserts through a table in his opposition brief—though largely without record citations—that he and Roe both suffered from mental illness, were verbally abusive and physically violent to each other, stalked each other, damaged each other's property, and sexually assaulted each other.  *Id.* at 7.[4]

Accepting these contentions, the record nonetheless shows beyond dispute that there were significant differences between Olson's and Roe's participation in the complaint process.  As far as the record and parties' briefing shows, Roe was an active and responsive participant in Macalester's investigation of her complaint against Olson.  The same cannot reasonably be said of Olson with respect to his complaint against Roe.  Beginning in November 2019, Macalester officials explained the complaint process to Olson on many occasions.  *E.g.*, A0468; A0483; A0486; A0506–A0507; A0501–A0502; A0516; A0513–A0514; A0531–A0535.  But the record shows that Olson was neither diligent nor cooperative in pursuing his complaint.  Olson frequently did not respond to Macalester officials' meeting requests to discuss and arrange for the preparation of his complaint.  *E.g.*, A0468; A0486; A0506–A0507; A0503; A0539–A0540.  Olson canceled scheduled meetings.  *E.g.*, A0469; A0502.  Macalester repeatedly described what information Olson would need to submit to initiate his complaint, *see, e.g.*, A0534, but Olson did not provide

---

[4]    One might reasonably reject Olson's table for its lack of citations.  Fed. R. Civ. P. 56(c)(1)(A).  As one example, Olson claims in the table that he and Roe both suffered from disabilities caused by mental illness.  As support for his assertion that Roe suffered from mental illness, Olson asserts only: "Roe claimed various self-diagnosed mental maladies, never confirmed, but accommodated and taken as true by Macalester."  ECF No. 95 at 7.  Olson cites no record evidence to support this assertion.

it.  On one occasion, for example, Farganis emailed a series of questions to Olson, describing the questions as "the same kind of questions we asked [Roe] before moving forward with her formal complaint."  A0531–A0535.  As far as the record shows, Olson did not respond to these questions.  Though Olson understood that Farganis was supportive of Olson's interest in pursuing a complaint against Roe, *see* A0542 ("Dion has continued to push/support me to file a Title IX against [Roe]."), Olson at times expressed uncertainty about whether to proceed with a complaint, A0542.  Many of these issues continued after Olson had his complaint-intake meeting in March 2020.  Bradley sent a draft complaint to Olson on March 19, asking him to review and approve it or request revisions.  A0627; ECF No. 98-1 at 76–78.  Olson responded on March 30, describing the complaint as "woefully brief," indicating he would "update" it after the investigation began, and demanding that Macalester "send the f*cking letter . . . NOW."  A0633–A0634.  The record does not show that Olson ever updated the document.  At Olson's request, deadlines were extended.  *E.g.*, A0797; A0792–A0793; A0878.  And Olson did not demonstrate compliance with Macalester's procedures governing his review of Roe's written response.  A0893; A0897.  Again, there is no suggestion that Roe engaged in any comparable behaviors in Macalester's investigation of her complaint against Olson.

These differences between Olson and Roe's participation in the complaint process are material.  Olson's conduct unquestionably delayed the commencement and progress of the investigation into his complaint.  And Olson's conduct just as indisputably factored into Macalester's ultimate decision to drop its investigation of the complaint.  As Macalester explained in its final email, its decision "was made based on the fact that neither

[Olson nor Roe] are currently students at the College and on the College's . . . conclusion that [Olson] violated the rules of the supervised review of investigation materials." A0900. As noted, Olson focuses on the similarities between his and Roe's abusive treatment of each other. He does not address the different approaches he and Roe pursued as part of Macalester's investigation of their respective complaints. It is beyond dispute that Olson's lack of diligence and cooperation factored significantly in Macalester's decision not to continue with Olson's complaint-resolution process. Given these differences, a reasonable jury could not find that Olson and Roe were similarly situated in all relevant respects.

Olson advances several arguments to show that he and Roe are comparators—or, more precisely, to show that a reasonable jury could find they are—but none of these arguments is convincing. Olson blames Farganis for Macalester's delay in beginning an investigation of his complaint against Roe, asserting that "Farganis dragged out Olson's formal complaint almost 4 months before Macalester launched any investigation of Roe." ECF No. 95 at 15–16. Olson cites no record evidence to support this assertion. *See id.* Olson does not address the extensive record evidence showing that he was responsible for delays or, more to the point, that his investigation conduct was materially different from Roe's. Olson argues that two Third Circuit cases—*Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022) and *Doe v. Univ. of the Scis.*, 961 F.3d 203 (3d Cir. 2020)—support the conclusion that he and Roe are comparators. The cases are distinguishable procedurally and factually. Procedurally, both cases reverse district court orders dismissing Title IX sex-discrimination complaints under Rule 12(b)(6). *Princeton Univ.*, 30 F.4th at 339–40; *Univ. of the Scis.*, 961 F.3d at 205. Here, by contrast, the issues are presented via a

summary-judgment motion with an extensive record.   Factually, neither case involves differences between the plaintiff and the comparator's complaint-process participation that we have here.   Olson argues that "requirements for comparators in a selective enforcement case should be liberally construed."   ECF No. 95 at 35.   Olson cites no case adopting or applying this rule of liberal construction.   Olson cites only a Second Circuit case, *Radwan v. Manuel*, 55 F.4th 101 (2d Cir. 2022), for the proposition that: "'Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury.'"   *Id.* at 132 (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).   True enough. But the question's factual nature does not preclude a court from entering judgment as a matter of law when the record evidence does not reasonably support the finding.   *See Unity Healthcare, Inc. v. Cnty. of Hennepin*, No. 14-cv-114 (JNE/JJK), 2015 WL 2097668, at *3 (D. Minn. May 5, 2015) (citing cases).   That is what we have here.

(2) Olson's second theory is that Macalester's investigation "was a garbage-in/garbage-out process" that produced "a distinctly warped outcome that is, in parts, completely lacking in substantial evidence."   ECF No. 95 at 26.   Olson identifies many flaws in Macalester's investigation that he says would permit a reasonable jury to find that Macalester discriminated against Olson on the basis of his sex.

Begin by positioning Olson's arguments against controlling legal rules.   To get past summary judgment, Olson must show the presence of "'clear procedural irregularities'" or other shortcomings that "result[ed] in findings so devoid of substantive content as to be unworthy of credence."   *Rossley*, 979 F.3d at 1193 (quoting *Menaker*, 935 F.3d at 35).   It is not enough, in other words, for Olson to identify mere imperfections or flaws in

Macalester's investigation.  Olson must show the presence of obvious problems with the investigation and then show how those problems render the investigation and Macalester's decisions unsupported.  Only then could a jury reasonably find that the investigation itself shows sex discrimination.

Olson asserts that Macalester "consistently failed to investigate" the fact that he and Roe were "committed to consensual rough sex."  ECF No. 95 at 4.  He says that Roe "repeatedly asked him to hit her" and that Macalester's failure to investigate these facts deprived him of a "consent" defense.  *Id.*  Olson is correct that the initial Investigative Report, A0560–A0607, the Notice of Outcome, A0687–A0722, and the Appeal Decision, A0801–A0813, concerning Roe's complaint do not directly address what is in substance a consent defense.  This argument is nonetheless unpersuasive because, as each of these documents indisputably shows, Olson was interviewed on multiple occasions and had opportunities to respond to Roe's complaint and allegations.  In these interviews, Olson routinely denied Roe's allegations that he was physically abusive.  *E.g.*, A0573 ("[A]fter hearing [Roe's] account regarding the incident where he hit her with a blanket on their bed, Ian stated, 'No, I have no memory of that.'"); *id.* ("After hearing [Roe's] account that he threw her out of the car when she didn't wear her seatbelt, Ian stated, 'I didn't throw her out of the car, but I asked her to get out.'"); A0574 ("After hearing [Roe's] account that he grabbed her wrists and caused bruising on multiple occasions, Ian stated, 'There were no bruises on her wrists.  That added detail or insinuation is absolutely false.'").  Olson's denials aside, Macalester's investigation process gave Olson ample opportunities to raise

a consent defense, and Olson does not suggest that these documents misrepresent either the extent of Macalester's questions or the content of his responses.

Olson next argues generally that "Macalester favored Roe's initial report . . . but did nothing to encourage Olson's complaint." ECF 95 at 12. The record belies this assertion. As discussed above, Macalester officials repeatedly explained the complaint process to Olson, reached out to Olson on those occasions he was non-responsive, repeatedly attempted to schedule an intake meeting to begin Olson's complaint and investigation process, and extended Olson's deadlines. Olson himself understood that Farganis was supportive of Olson's interest in pursuing a complaint against Roe. *See* A0542 ("Dion has continued to push/support me to file a Title IX against [Roe]."). No reasonable juror could find that Macalester tilted its investigation in Roe's favor.

Olson argues that Macalester should have interviewed Roe's former boyfriend, B.L. ECF No. 95 at 19. According to Olson, B.L. would have confirmed that Roe had engaged in a "pattern of abuse" against "mentally ill" boyfriends. *Id.* at 19–22. As part of her investigation, Duniway asked both Roe and Olson to identify others who might possess information regarding Roe's allegations. A0564. Roe responded with the names of fourteen individuals. *Id.* Olson responded with seven names. *Id.* Duniway ultimately interviewed six of the individuals Roe identified and three of the individuals Olson identified. *Id.* In her report, Duniway explained that she chose not to interview witnesses who "did not have first-hand information about the allegations and information they could provide would be duplicative of information provided by the parties and other witnesses." *Id.* As for B.L., Duniway explained that she "determined that the information

Ian stated this individual would provide would not be relevant to [Roe's] allegations" against Olson. *Id.*  In his deposition, B.L. confirmed that he had no personal, "firsthand" knowledge concerning Olson and Roe's relationship.  A0316–A0317.  B.L. testified that he did not reach out to Macalester to provide information about his relationship with Roe because "[he] didn't think that it would be of particular relevance to provide hearsay, essentially," and he did not think his information "would advance either side of the situation."  A0317.  In view of this testimony, Duniway's decision not to interview B.L. was consistent with the "firsthand knowledge" dividing line she drew for Roe and Olson's identified witnesses.  Olson does not seem to dispute that line's reasonableness.

Olson relies on Dr. Brandon's proffered testimony to argue "that Macalester's interviewers consistently solicited descriptions by Roe of 'harms' she allegedly suffered, but interviewers did not similarly solicit the harm experienced by Olson."  ECF No. 95 at 25.  As discussed above, however, Dr. Brandon's opinion testimony will be excluded.

Olson implies that Macalester's decision to employ attorneys associated with the Lathrop GPM firm was problematic.  *See id.* at 13 ("No sooner had Macalester processed Roe's formal complaint the Title IX Coordinator Farganis, a second-year associate at the firm GPM, hired the former managing partner of his law firm, Sarah Duniway, to investigate Olson."); *id.* at 27 ("*Macalester Turns to Mega Lawfirm* [sic] *GPM, which Appointed Exclusively Its Own Attorneys to 'Investigate,' Over Whom Title IX Coordinator Farganis Had No Authority*").  But Olson advances no discernable argument that Lathrop GPM's involvement in Macalester's investigations amounted to "clear procedural irregularities" or "result[ed] in findings so devoid of substantive content as to be unworthy

69

of credence." *Rossley*, 979 F.3d at 1193.  He does not explain why Lathrop GPM's involvement creates a triable issue.  The flaws Olson claims to identify in Macalester's investigations do not justify submitting his Title IX sex-discrimination claim to a jury.

<div align="center">B</div>

Olson asserts claims under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, and section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.  Compl. ¶¶ 254–64.  These claims are properly assessed together because "the substantive standards of § 504 . . . and the ADA are the same."  *Loye v. Cnty. of Dakota*, 625 F.3d 494, 496 (8th Cir. 2010).  To prevail on either claim, Olson must show that (1) he is disabled; (2) he made specific requests for (3) reasonable accommodations related to a (4) known disability; and (5) the denial of his requests (6) deprived him of meaningful access to education.  *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006).  "[T]he plaintiff 'bears the initial burden of demonstrating that he requested reasonable accommodations[,]'" and "the plaintiff must 'explain how each requested accommodation was necessary to enable him to participate in light of his disabilities.'"  *Rossley*, 979 F.3d at 1197 (quoting *Mershon*, 442 F.3d at 1077).

Olson's ADA and Section 504 claims are specific.  Olson asserts that "Macalester denied [him] the reasonable request to accommodate his disability to access his disciplinary file as an electronic copy and to have his advisor [*i.e.*, his attorney] allowed to access these documents without waiving his rights under Title IX."  ECF No. 95 at 29.  Olson later clarifies that the specific subject of this request was an electronic copy of Roe's response to his complaint.  *Id.* at 39.  To recap, Olson made this request by email on November 11,

2020. A0892. Macalester arranged for Olson to review Roe's response four days later, on

November 15, via Zoom. A0891. Olson attended the scheduled Zoom session and was

able to review Roe's response for a time. A0897. Macalester suspended Olson's review

because Olson turned off his camera during the session, thus preventing Macalester from

supervising the review in line with the College's policy. *Id.*; *see* A0392.

This claim is not viable. (1) There is no genuine dispute that Macalester provided

Olson with electronic access to Roe's response. Olson had the opportunity to review her

response by Zoom. Olson does not explain how this electronic form of access did not

meaningfully satisfy his request for an electronic copy.[5] Olson does not explain why his

disability could be accommodated only by giving him an electronic copy of Roe's response

that he could review without Macalester's supervision. (2) Olson tethers the request that

his attorney be permitted to review Roe's response without signing an advisor agreement—

not to his disability—but to a federal regulation promulgated by the Department of

Education. *See* ECF No. 95 at 29 (citing 34 C.F.R. § 106.45(b)(5)(vii)). Whatever the

merits might be regarding whether this regulation governed Macalester's handling of

Olson's complaint, Olson's reliance on the regulation says nothing about how or why

compliance with it was necessary to accommodate his disability.[6] To put it differently,

---

[5]     Nor does Olson deny that Macalester's termination of his remote review of Roe's
response occurred because he turned off the camera on his computer or other electronic
device.

[6]     According to the Department of Education, the regulation Olson cites became
effective August 14, 2020, and is not retroactive. *See* Nondiscrimination on the Basis of
Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed.
Reg. 30026, 30061 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106). In a publicly

Olson's reliance on the regulation does not connect his attorney-review request to his disability.  (3) Olson does not explain how the denial of his request for an electronic copy of Roe's response impaired or affected his ability to reply or engage in further proceedings regarding his complaint, and the record indisputably shows otherwise.  Olson's rebuttal submission quoted extensively from Roe's response, establishing that Olson was able to review, comprehend, and dispute the response.  *See* A0897.  Olson neither explains nor identifies how his participation in the process or his response might have improved had Macalester provided him with a copy of Roe's response.

<div align="center">C</div>

In his Complaint, Olson asserted three claims under Minnesota law: a breach-of-contract claim, alleging that Macalester's Student Handbook and Title IX policies were contracts and that Macalester breached those contracts during its investigation of Roe and

---

available question-and-answer document, the Department of Education, Office of Civil Rights explains "the appropriate standard for evaluating alleged sexual harassment that occurred before the 2020 amendments took effect" as follows:

> The 2020 amendments took effect on August 14, 2020, and are not retroactive.  This means that a school must follow the requirements of the Title IX statute and the regulations that were in place at the time of the alleged incident; the 2020 amendments do not apply to alleged sexual harassment occurring before August 14, 2020.  This is true even if the school's response was on or after this date.  In other words, if the conduct at issue in the complaint took place prior to August 14, 2020, the 2020 amendments do not apply even if the complaint was filed with a school on or after August 14, 2020.

Off. of Civ. Rts., U.S. Dep't of Educ., *Questions and Answers on the Title IX Regulations on Sexual Harassment* 10 (updated June 28, 2022), https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf (last visited July 5, 2023).

Olson's complaints; a claim for breach of the implied covenant of good faith and fair dealing derived from the breach-of-contract claim; and a negligence claim, alleging that Macalester's investigation breached its "duty to fairly and equitably investigate claims of harassment and misconduct, without bias or discrimination."  Compl. ¶¶ 265–84.

That leaves just Olson's common-law negligence claim.  To show that this claim is trial-worthy, Olson must identify evidence from which a reasonable jury could find that Macalester's decision to expel him was arbitrary, capricious, or in bad-faith.  *Doe v. Univ. of St. Thomas*, 972 F.3d 1014, 1018 (8th Cir. 2020).  "The Minnesota Supreme Court has long held that an 'action is arbitrary, oppressive, and unreasonable so that it represents [the agency's] will and not [its] judgment.'"  *Id.* (quoting *Webster v. Marshall*, 133 N.W.2d 533, 535 (Minn. 1965)).  A disciplinary decision is arbitrary and capricious if, for example, it is tainted by "actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome."  *Id.* at 1019 (quoting *Richmond v. Fowlkes*, 228 F.3d 854, 858 (8th Cir. 2000)).  "A university's decision may be arbitrary if the university violates


Olson has abandoned his claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  Though Macalester sought summary judgment on these claims, *see* ECF No. 79 at 35–37, Olson did not defend or address these claims in his response, *see generally* ECF No. 95.  "It was [Olson's] responsibility to show that there were genuine issues of material fact in the record that precluded the summary judgment [Macalester] sought."  *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734 (8th Cir. 2009).  Olson's silence means these claims are waived.  *Id.* at 735 ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

its own procedures." *Id.* (quoting *Tatro v. Univ. of Minn.*, 800 N.W.2d 811, 816 (Minn.

Ct. App. 2011), *aff'd on other grounds*, 816 N.W.2d 509 (Minn. 2012)).  A decision is not

arbitrary just because "the [educational institution], presented with opposing points of

view, reaches a reasoned decision that rejects one point of view."  *Vanegas v. Carleton*

*Coll.*, 575 F. Supp. 3d 1112, 1122 (D. Minn. 2021).

Olson defends his negligence claim on essentially the same grounds he defended his

federal claims.  This is the totality of Olson's argument:

> Here, there is sufficient evidence that Macalester acted
> arbitrarily through a process infected by bias against Olson.
> Macalester's interviewers skewed their investigation against
> the male student, and the school first stonewalled Olson's
> complaint (while coddling Roe at every step), then finally
> cancelled it after denying Olson the reasonable
> accommodation of receiving an electronic copy of his
> disciplinary file.  He was denied an opportunity to be heard
> when his complaint against Roe was cancelled
>
> In particular, the denial of his request for reasonable
> accommodation could serve no other purpose than simply
> depriving Olson access to evidence—a hall mark [sic] of due
> process that *Abbariao* imposes on college disciplinary
> decisions.  Macalester canceled Olson's complaint rather than
> allow him an electronic copy of his file, even though its then
> effective Title IX policy, in conformity with 34 C.F.R. 106.1,
> et seq., required Macalester to provide electronic copies to
> parties and their advisors for all complaints filed after August
> 14, 2020.

ECF No. 95 at 41.  Olson's reliance on the same arguments he advanced to defend his

federal claims means that his negligence claim is not trial-worthy, either.  Olson has

identified no evidence from which a jury might reasonably find that Macalester

discriminated against him on the basis of his sex.  As explained above, Olson's complaints

74

regarding Macalester's investigations do not show that.  Macalester's refusal to provide Olson unsupervised access to an electronic copy of Roe's response to his complaint did not violate Macalester's policies, does not show arbitrariness or bad faith, and no reasonable juror could find that it deprived Olson access to evidence—he indisputably had the opportunity to review her response—or that it meaningfully impaired his ability to reply to her response.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Defendant Macalester College's Motion to Exclude Expert Testimony [ECF No. 86] is **GRANTED IN PART** and **DENIED IN PART** as explained in Part II, above.

2.      Defendant Macalester College's Motion for Summary Judgment [ECF No. 77] is **GRANTED**.

3.      Plaintiff Ian Olson's Complaint is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


 Dated:  July 5, 2023                              s/ Eric C. Tostrud
                                                   Eric C. Tostrud
                                                   United States District Court